# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:
**ANDREA L. CIOBANU**
**ALEX BEEMAN**
Ciobanu Law, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
**LARRY D. ALLEN**
Deputy Attorneys General
Indianapolis, Indiana

**GARY D. SECREST**
Assistant Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| CHARLES P. WHITE | ) |
| | ) |
| Appellant-Defendant | ) |
| | ) |
| vs. | ) No. 29A05-1312-PC-641 |
| | ) |
| STATE OF INDIANA | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Steven R. Nation and Daniel J. Pfleging, Judges
Cause Nos. 29D01-1103-FC-3107 and 29D02-1303-PC-2053

**December 29, 2014**

**OPINION – FOR PUBLICATION**

**VAIDIK, Chief Judge**

## Case Summary

Four months after Charles "Charlie" P. White was elected Indiana Secretary of State, a Hamilton County grand jury indicted him on seven felonies, including theft, perjury, and voter fraud. The charges arose from White's conduct while he was a member of the Fishers Town Council and a candidate for Secretary of State; specifically, he purchased a townhome outside his district but kept his town-council position; submitted a form to the Hamilton County Board of Voter Registration that changed his address from his apartment to his ex-wife's house, which was located inside his district; voted in the May 2010 primary election using his ex-wife's address; and applied for a marriage license using his ex-wife's address. Former Marion County Prosecutor Carl Brizzi defended White at trial. A jury convicted White of six of the seven counts, and the trial court sentenced him to one year of electronic home monitoring. His sentence was stayed pending appeal.

White utilized the *Davis-Hatton* procedure to temporarily suspend his direct appeal and seek post-conviction relief in the trial court. The trial court denied White's request for post-conviction relief, which alleged, among other things, that Attorney Brizzi was ineffective. White's reinstated direct appeal and the appeal of the denial of post-conviction relief are now before us.

We divide White's claims into direct-appeal and post-conviction issues, and we ultimately conclude that three of White's convictions must be vacated. As the State

2

concedes, two of the convictions violate double-jeopardy principles. As for the third conviction, the perjury charge against White should have been dismissed because it was based on White's street address, which was not material to his marriage-license application—only the county of residency is material. As for White's post-conviction claims, we conclude that Attorney Brizzi was not ineffective. We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

White and Nicole White (now Mills) were married in 1998, and they have one son who was born in 2001. State's Ex. 39. White and Nicole lived together at 7527 Broad Leaf Lane in Fishers ("Broad Leaf"), which is in Hamilton County, Delaware Township, Precinct 12. White was an attorney[1] for the Indiana Department of Natural Resources ("DNR"); he was also the Hamilton County Republican Party Chairman and a member of the Fishers Town Council, representing District 2.[2] Tr. p. 917. White made approximately $1000/month as a town-council member. State's Ex. 34.

In December 2006 White and Nicole divorced, and they shared joint custody of their son. *Id.* Nicole remained at Broad Leaf with their son, while White moved to an apartment at 6994 Pintail Drive in Fishers ("the Pintail apartment"), which was in Delaware Township, Precinct 14. Like Broad Leaf, the Pintail apartment was located within the

---

[1] As a result of White's convictions in this case, the Indiana Supreme Court suspended White from the practice of law in April 2012. The Court later granted White's request for a stay "pending resolution of post-conviction relief proceedings and appeals relating to the criminal convictions at issue." *In re Charles P. White*, 49S00-1203-DI-156 (Ind. Nov. 1, 2012). Justice Massa did not participate.

[2] In 2012 the residents of Fishers voted to become a city. On November 17, 2014, the Fishers Town Council approved an ordinance for the transition from the Town of Fishers to the City of Fishers. *Fishers Town Council Adopts City Transition Ordinance*, FISHERS.IN.GOV, http://www.fishers.in.us/CivicAlerts.aspx?AID=278 (last visited Dec. 22, 2014).

district that White represented, District 2.  Approximately one month after the divorce, White conveyed his interest in Broad Leaf to Nicole via quitclaim deed.  State's Ex. 40.

About two years after the divorce, in November 2008, White began dating Michelle Quigley, and they later became engaged.  P-C App. p. 926.

In January 2009 White formed a campaign committee aimed at his candidacy for Indiana Secretary of State.  P-C Tr. p. 572.  The duties of the Secretary of State, the third highest-ranking office in state government, include oversight of state elections.  Indiana Secretary of State, *About the Office*, IN.GOV, http://www.in.gov/sos/2362.htm  (last visited Dec. 21, 2014).  White traveled approximately every other day while campaigning, sleeping at night in people's homes and hotels across the state.  P-C Tr. p. 572-73.

White moved out of the Pintail apartment in May or June 2009.  He notified the Town of Fishers to change his address to Broad Leaf, where his ex-wife and son still lived.  State's Ex. 54.

In September 2009 White executed a purchase agreement and placed a deposit for the purchase of a townhome at 13086 Overview Drive in Fishers ("Overview").  State's Ex. 1, 2, & 16.  Notably, Overview was located in Fall Creek Township, Precinct 5—not in White's town-council district.  State's Ex. 54.  Because White had problems getting approved for a mortgage, on November 5, 2009, he signed a lease for Overview until he could get an FHA mortgage for the townhome; the lease term began November 13, 2009.  State's Ex. 17; Tr. p. 715-16, 772.  White was the only tenant listed on the lease, and the lease agreement prohibited assignment and subletting of the lease without the prior written consent of the landlord/builder.  State's Ex. 17.  According to the lease, all notices

4

concerning the townhome were to be sent to White at Overview. *Id.* When White executed the lease, he told the landlord/builder that "he was living in his ex-wife's basement," but White gave no indication that he would not be moving into the townhome. Tr. p. 776-77.

A special election was held in Hamilton County on November 10, 2009, regarding the Hamilton Southeastern School Corporation. State's Ex. 43. White voted in person at the Precinct 14 (the Pintail apartment) polling site. *Id.* He indicated in the poll book, however, that his address had changed from the Pintail apartment to Broad Leaf located in Precinct 12. *Id.*

White signed a mortgage application for Overview on January 28, 2010. On the documents, he listed Overview as his "Present" and "Mailing" addresses and Broad Leaf as his "Former" address. State's Ex. 22. White wrote that he had been living at Overview for ".2" years, or approximately 2.4 months. *Id.* When White left his job at DNR in February 2010, he told DNR to mail his final paycheck to Overview. State's Ex. 38.

On February 22, 2010, White filed an address change with the Hamilton County Board of Voter Registration indicating that his address had changed from the Pintail apartment to Broad Leaf.[3] State's Ex. 46.

White signed another mortgage application for Overview on February 26, 2010, and again claimed to have been living there for .2 years. State's Ex. 22. The main difference between the January and February applications was the addition of Krieg DeVault LLP as

---

[3] This conduct led to White being charged with and ultimately convicted of Count 1 (submission of a false, fictitious, or fraudulent voter's registration application) and Count 2 (perjury).

White's new employer, as White had begun working there February 1.[4]  State's Ex. 14 & 22.  Also on February 26, White executed closing and financing documents for Overview, including two Occupancy Statements required by FHA indicating that White either occupied or would occupy Overview as his "primary residence" within thirty or sixty days.  State's Ex. 24 & 25.

On May 4, 2010, more than sixty days after White closed on the Overview townhome, White voted in the primary election in Precinct 12 using his ex-wife's address at Broad Leaf—not the Overview address located in Precinct 5—and wrote in the poll book that his address was "Unchanged."[5]  State's Ex. 47.  The next week, on May 11, White filed his Declaration of Candidacy with the Indiana Republican Party, stating that he was seeking the nomination at the 2010 Republican State Convention for the Office of Indiana Secretary of State.  State's Ex. 50.  He listed Broad Leaf as his residence.  *Id.*

On May 18, 2010, White again listed Broad Leaf as his "Residence Address" when submitting an application to marry Michelle.  State's Ex. 52 ("State of Indiana Application for Marriage License").  The application also requested a "New Address," and White listed Overview.  *Id.*  Michelle listed her parents' address on Farragut Circle in Fishers as her "Residence Address" and Overview as her "New Address."  *Id.*  White and Michelle were married over Memorial Day weekend 2010.  State's Ex. 53.

---

[4] Krieg DeVault sent its offer of employment to White at Overview, and White provided Krieg DeVault with Overview as his address for purposes of payroll and his federal I-9 form.  State's Ex. 11, 14; *see also* Tr. p. 758.

[5] This conduct led to White being charged with and ultimately convicted of Count 4 (voting in other precinct) and Count 5 (procuring, casting, or tabulating a false, fictitious, or fraudulent ballot).

In June 2010 White received the Republican Party's nomination as candidate for Secretary of State. State's Ex. 49. On June 22, 2010, the Republican Party submitted its certification of nomination—listing White as the party's candidate for Secretary of State— with the Indiana Election Commission. *Id.* The form listed Overview as White's residence and Broad Leaf as his mailing address. *Id.*

On September 21, 2010, while White was campaigning for Secretary of State, a former Democratic candidate for the Fishers Town Council held a news conference to call for White to withdraw from the race for Secretary of State because he used his ex-wife's address to vote in the May 2010 primary. State's Ex. 54. The former candidate also said a special prosecutor should be appointed to determine if White's actions were criminal and demanded that White repay the money he had earned as a town-council member while living outside his district. *Id.* White immediately stepped down from his position on the Fishers Town Council. *Id.* Following his resignation, White agreed to return the compensation he had received after becoming ineligible to serve. The deputy town treasurer helped White calculate the amount of money that he owed the Town of Fishers. Tr. p. 882; State's Ex. 34 & 35. White paid back a total of $5142.88, which reimbursed the Town of Fishers for compensation that he had received since mid-April 2010. State's Ex. 34 & 35.

On September 22, 2010, the day after White resigned, he submitted a voter-registration application changing his address from Broad Leaf to Overview. State's Ex. 48.

White ultimately won the November 2010 general election for Secretary of State, defeating his Democratic Party opponent Vop Osili by more than 300,000 votes. *White v. Ind. Democratic Party ex rel. Parker*, 963 N.E.2d 481, 484 (Ind. 2012). On November 19, 2010, Daniel Parker, the chairperson of the Indiana Democratic Party, filed a verified petition for election contest with the Indiana Election Division. The petition alleged that White was not qualified to assume the office of Secretary of State because he was not registered to vote at the address where he resided as of July 15, 2010—the deadline for the Republican Party to file its certificate of nomination—in accordance with Indiana Code section 3-8-1-1(b)(1). *Id.* The Recount Commission held a hearing and received evidence, and in June 2011 it determined that White was eligible to run as a candidate for Secretary of State in 2010. *Id.* at 485. In December 2011 the Marion Circuit Court reversed the Recount Commission, but in March 2012 our Supreme Court affirmed the Recount Commission. *Id.* at 489-90.[6]

---

[6] Our Supreme Court reasoned:

Our conclusion is that the Code places a burden on political campaigns to investigate and vet their opposition before the pre-election time limitations expire, but that is better than the alternative: that a challenger might ignore a known (or knowable) disqualification challenge before the election, wait to see who won at the polls, and then seek to set aside the results of the democratic process. Such a result is inconsistent with free elections and respect for voters' expressed preferences.

Here, the allegations of White's registration impropriety arose before the election and were made public by private citizens, the media, and by the Osili campaign and by the Democratic Party. It is likely that the average voter was aware that there were concerns about White's voter registration history at the time of the election, but we will not, on the basis of the present petition, judicially disenfranchise voters who went to the polls aware of what were at that moment only allegations. The fact that criminal charges were filed after the election and resulted in convictions (appeals still pending) does not alter that conclusion.

*White*, 963 N.E.2d at 489-90.

8

In the meantime, citing conflict, the Hamilton County Prosecutor at the time petitioned for the appointment of a special prosecutor. The trial court appointed three special prosecutors—John E. Dowd, Daniel J. Sigler Sr., and Daniel J. Sigler Jr.—to investigate White's voting and voter registration.

A grand jury was convened in Hamilton County, and in March 2011 it indicted White on the following seven counts:

- Count 1: Class D felony submission of a false, fictitious, or fraudulent voter's registration application for "knowingly or intentionally sending a voter registration change[-]of[-]address form to the Hamilton County Board of Voter Registration [in February 2010] representing his new address was 7527 Broad Leaf Lane . . . when he knew he was or would be living at 13086 Overview Drive . . . at the time of the next election (May Primary 2010)."

- Count 2: Class D felony perjury for "knowingly or intentionally making a false material statement under oath or affirmation knowing the statement to be false or not believing it to be true . . . on his State Voter's Registration Change Form [in February 2010] stating his residence was changing from 6994 Pintail Drive . . . to 7527 Broad Leaf Lane . . . when in fact at the time of making said statement he was residing at 13086 Overview Drive . . . ."

- Count 3: Class C felony fraud on a financial institution regarding documents he executed at his February 2010 mortgage closing.

- Count 4: Class D felony voting in other precinct in May 2010 for "knowingly or intentionally voting in Delaware Township Precinct 12 indicating his residence was 7527 Broad Leaf Lane . . . when in fact he resided at the time at 13086 Overview Drive . . . , which is located in Fishers Fall Creek Township Precinct 5."

- Count 5: Class D felony procuring, casting, or tabulating a false, fictitious, or fraudulent ballot in May 2010 for "knowingly or intentionally casting a vote . . . in the Delaware 12 Precinct when he was residing in . . . Fall Creek Township No. 5 Precinct (13086 Overview Drive)."

- Count 6: Class D felony perjury in May 2010 for "knowingly or intentionally making a false material statement under oath or affirmation, knowing the statement to be false or not believing it to be true, [by] stating on his marriage[-]license application to the Hamilton County Clerk's Office and

9

made under affirmation of the truth thereof, that his residence was 7527 Broad Leaf Lane . . . when it was 13086 Overview Drive . . . ."

- Count 7: Class D felony theft for "taking his pay as a City Council member for Fishers Council District 2 during the period of approximately November 5, 2009[,] through September 28, 2010, when he did not reside in said Fishers Town council district."

Appellant's App. p. 74-86.

After firing his first lawyer, White hired former Marion County Prosecutor Carl Brizzi to represent him at trial. In September 2011 White filed a motion to dismiss the charges against him. *See id.* at 210-35. In his motion to dismiss, White challenged the authority and conduct of the special prosecutors, alleged double jeopardy with respect to certain charges,[7] and contested the validity of other charges, including theft and perjury. *See id.* With respect to the theft charge, White argued, among other things, that "he was at all relevant times, ***entitled*** to hold-over his official position[] until his [town-council] successor was identified and qualified to assume the office, and as such was entitled to benefits and privileges of the office," including his monthly town-council salary. *Id.* at 226. As to the perjury charge, White argued that his address, as provided on his marriage-license application, was not material as required for a perjury charge. *Id.* at 222-24.

The trial court, the Honorable Steven R. Nation, disposed of White's motion-to-dismiss claims in two written orders. First, in an order dated November 16, 2011, Judge Nation rejected White's arguments regarding the special prosecutors' authority and

---

[7] White argued that Counts 1 and 2 and Counts 4 and 5 violated Indiana's Double Jeopardy Clause. *See* Appellant's App. p. 231-34. The Honorable Steven R. Nation disagreed, saying only: "Contrary to [White's] allegation concerning the Double Jeopardy Clause, the Court can find no basis for such contention for the reason that jeopardy has not attached to [White]." *Id.* at 383.

10

conduct.[8]  *Id.* at 330-36.  In a second order dated December 19, 2011, Judge Nation dismissed White's remaining claims, stating, in relevant part:

> Contrary to [White's] allegation concerning Count 6, Perjury, his sworn statement as to his residence is material.  The Court finds that as a matter of law, the legislature, pursuant to [Indiana Code section] 31-11-4-4 has determined that residence is a question to be answered on the application for marriage.  Therefore the legislature has determined that residence is material to such application.

> \*     \*     \*     \*     \*

> Contrary to White's allegation [regarding the theft charge] that his de facto status operated as an absolute bar to felony prosecutions, the Court can find no basis for such a contention.

> \*     \*     \*     \*     \*

> [C]oncerning any other allegation of [White] not specifically discussed by the Court, the Court finds there is no sufficient basis for the dismissal of the indictments.

> Therefore, [White's] Motion to Dismiss should be and is hereby DENIED.

*Id.* at 383-84.

A five-day jury trial was held in January-February 2012.  The State's theory at trial was that White continued to take his $1000/month town-council salary even though he no longer resided in District 2 because he needed the money.  *See* Tr. p. 679 (State's opening statement: "While [White] made a decent salary with the DNR . . . about $75,000 more or less a year, supplemented by a $1,000 a month stipend from the Town of Fishers, gross, for serving as a councilman, he was not, and the evidence will show, . . . in great financial shape.  Like many people he was living month to month.  He had a laundry list of bills.  He had a subpar credit rating, and he had little or no cash with which to purchase a home.  He

---

[8] We do not discuss Judge Nation's reasoning on this issue because White does not renew this challenge on appeal.

11

gave up his apartment . . . in order to save some money . . . ."). As for the defense theory, Attorney Brizzi wanted to convince the jury that this case was "not about some Machiavellian family who conspired to cover up the alleged move so Charlie could continue to receive his $1000 per month stipend." P-C Tr. p. 290. Attorney Brizzi had intended to call some witnesses to establish that White was living at Broad Leaf, but when problems arose during trial, he switched strategies and argued that the State had not met its burden of proof. *Id.* at 285.

Nicole's next-door neighbor at Broad Leaf testified for the State at trial. Specifically, he testified that White moved out in 2006 as part of the divorce. Tr. p. 821-22, 828. After White moved out, the neighbor did not see White living at Broad Leaf and did not see White's car parked at Broad Leaf overnight. *Id.* at 824-25, 835.

The State presented utility records from Overview, indicating that White had put the electricity and water bills in his name in November and December 2009 and received those bills at Overview. State's Ex. 41 & 42; Tr. p. 902-04. The State also presented White's voting records, candidate filings, his and Michelle's marriage-license application, and their marriage license. State's Ex. 43-52; Tr. p. 902-04. In addition, the State presented an article from The Indianapolis Star, wherein White acknowledged "splitting time" between his ex-wife Nicole's home on Broad Leaf and his new townhome on Overview beginning in November 2009. State's Ex. 54 (Carrie Ritchie, *GOP Secretary of State Candidate Downplays Residency, Voting Controversy*, Indianapolis Star, Sept. 22, 2010); Tr. p. 910. In the article, White said he then moved into Overview in March 2010, which was before the primary election in May 2010. State's Ex. 54. White blamed his busy schedule for

failing to (1) notice that Overview was outside his town-council district and (2) change his voter registration to reflect his new address on Overview. *Id.*

Finally, the State presented evidence about White's cell-phone usage in order to prove that he was living at Overview. Tr. p. 918-19, 963-64. This evidence consisted of 600 pages of 30,000 phone calls and text messages from White. State's Ex. 56. An employee from Sprint testified that Sprint's Tower 074 is 0.75 miles from Overview, while Sprint's Tower 07 is 0.5 miles from Broad Leaf. The distance between the two homes is 6.75 miles "as the crow flies." *Id.* at 919. The effective range of each tower is approximately two miles or less. *Id.* at 960. The Sprint records indicated a "hit" each time a call started or ended from Tower 074 or 07. From November 13, 2009, to May 28, 2010, Sprint recorded 1366 hits from White's cell phone on the tower near Overview—but only 382 hits from the tower near Broad Leaf. State's Ex. 58. During overnight hours of 6:00 p.m. to 7:59 a.m. for the same time period, Sprint recorded 530 hits for the tower near Overview and 66 hits for the tower near Broad Leaf. *Id.* Sprint's witness acknowledged that the records did not show the caller's exact location but rather the "general area." Tr. p. 969.

At the conclusion of the State's case-in-chief, the defense abruptly rested without presenting any evidence. *Id.* at 978. Attorney Brizzi wanted to catch the State "off guard." P-C Tr. p. 257. After approximately thirteen hours of deliberation, the jury found White guilty of Counts 1, 2, 4, 5, 6, and 7 and not guilty of Count 3 (fraud on a financial institution). The trial court sentenced White to one year on electronic home monitoring but stayed the sentence pending appeal. Appellant's App. p. 14. As a result of White's

convictions, Governor Mitch Daniels appointed Connie Lawson as the new Secretary of State. Press Release, Governor Appoints Senator Connie Lawson as New Secretary of State (Mar. 16, 2012), http://goo.gl/Tw5RbO.

White initiated a direct appeal under Cause No. 29A05-1203-CR-123. In September 2012 this Court dismissed White's direct appeal without prejudice so that he could pursue post-conviction relief. *See White v. State*, Cause No. 29A05-1203-CR-123 (Ind. Ct. App. Sept. 7, 2012) ("This Court DISMISSES THIS APPEAL WITHOUT PREJUDICE so that [White] may pursue post-conviction relief before the trial court. If any part of the trial court's forthcoming ruling on [White's] petition for post-conviction relief is adverse to [White], [White] may, after filing a new notice of appeal, raise the issues he would have raised in this appeal along with the new issues created by the trial court's ruling on the petition for post-conviction relief.").

In March 2013 White, now represented by Attorney Andrea Ciobanu, filed a petition for post-conviction relief, which was later amended. White also requested a change of judge, which the court granted, and Judge Daniel J. Pfleging was appointed.

In his petition, White raised eight freestanding claims and eight claims of ineffective assistance of trial counsel; White also alleged that "[m]aterial facts existed which were not previously presented or heard that require vacation of [his] conviction[s]." P-C App. p. 1004-05. The State filed a motion for summary disposition as to the eight freestanding claims, which the post-conviction court granted. *Id.* at 1851. The court also summarily denied White's ineffective-assistance-of-counsel claims regarding trial counsel's (1) failure to tender proposed instructions and failure to object to the State's instructions, (2)

14

failure to file a motion to correct errors, and (3) failure to adequately cross-examine the State's witnesses. *Id.* at 1851-52.

An evidentiary hearing was held on the remaining claims over the course of three days. In support of his ineffective-assistance-of-counsel claims, White presented several witnesses, including White himself, Attorney Brizzi, his ex-wife Nicole, Nicole's new husband Bill Mills, White's new wife Michelle, and a potential expert witness on cellular phones, Ryan Harmon.

White testified at the post-conviction hearing that he wanted to testify at trial, but he did not insist on testifying and eventually relented to Attorney Brizzi's decision not to present any evidence at trial. P-C Tr. p. 533, 609, 641-42. According to White, he moved out of the Pintail apartment in late May/early June 2009; he then moved into Nicole and Bill's home on Broad Leaf and stayed there until after his wedding on May 28, 2010. *Id.* at 544-45, 563, 570. White testified that during that time he had "complete 100 percent access" to Broad Leaf. *Id.* at 552. According to White, he leased Overview for his then-fiancée Michelle and her children. *Id.* at 562-63, 565-66. He said he did not live at Overview before they were married "to respect [Michelle's] wishes." *Id.* at 563. White admitted to voting in the May 2010 primary in Hamilton County but claimed that he used a MicroVote Infinity electronic voting system, which is a direct-record machine that does not use ballot labels. *Id.* at 572. White explained that ballot labels, which were previously used in electronic voting machines, were no longer produced. *Id.* Accordingly, he claimed that he did not cast a "ballot" as currently defined by Indiana law. *Id.*

15

Attorney Brizzi testified that he "spent hundreds and hundreds and hundreds of hours on this case." *Id.* at 219. His efforts included conducting research, filing a motion to dismiss and a request for an interlocutory appeal, garnering stipulations from the State for several binders of potential exhibits, speaking to potential witnesses, conducting a deposition, reviewing transcripts from the grand jury and Recount Commission, and testing potential defenses with an informal focus group. Attorney Brizzi testified that he decided not to present Michelle, Nicole, or Bill as witnesses because Michelle admitted during witness preparation that White did not live at Broad Leaf:

> When I was attempting to prepare Michelle for cross examination – this was 48 to 72 hours before the close of evidence – she blurted out in response to a fairly aggressive cross examination question by me, that Charlie really didn't live there, live there referring to . . . Nicole's house, on Broad Leaf. And when pressed further, . . . it was a pretty emotional time during the Overview condo—me, Charlie, and Michelle—and I looked at Charlie, and I said, "If . . . that happens on cross, you're sunk." And at that time, we decided that we not only couldn't call Michelle, but that we couldn't call Nicole or her husband.

*Id.* at 208; *see also id.* at 291 (Attorney Brizzi testifying that he thought he was "ethically prohibited" from calling Michelle as a witness). Attorney Brizzi also decided not to call White as a witness because he did not think he could control White's testimony on the stand, which would have "been, in [his] professional opinion, a disaster." *Id.* at 217. As an example, Attorney Brizzi described a controlled interview that White did with a local newspaper, which Attorney Brizzi treated as a dress rehearsal for trial. However, White "came off really badly" during the interview. *Id.* at 219. Attorney Brizzi also testified that while this case was pending, White often acted against his advice, such as trying to get Marion County Prosecutor Terry Curry to prosecute Senators Evan Bayh and Richard

16

Lugar for voter fraud. *Id.* at 318; *see also id.* at 217 (Attorney Brizzi: "Throughout the trial . . . it was everything I could do to just keep [White] to not react to adverse rulings, not making eye contact with the prosecutors in a way where he wanted to fight everybody. There were times where he was staring down Sigler or Dowd, and it was all I could do to just keep him to . . . maintain compos[ure]. So, if he were to be on the witness stand with three very experienced prosecutors who would have come at him very differently and much more aggressively than they did at the Recount Commission, . . . I told him . . . instead of a 13 hour jury deliberation it would have been about a 30 minute jury deliberation.").

Michelle testified at the post-conviction hearing about her witness preparation with Attorney Brizzi, which occurred at Overview the night before the State rested. *Id.* at 421. White's attorney questioned Michelle as follows:

Q:    Okay. So, what was your conversation with Mr. Brizzi?
A:    We sat down in the family room and he asked one question.
Q:    Okay. What did he ask?
A:    He asked something about when Charlie moved in with Nicole and when he started living there.
Q:    Okay.
A:    And the way he said it was implying that they were getting back together.
Q:    Okay. And what did you respond?
A:    I said, well, he wasn't living, living there in that sense, and then he cut me off.

*Id.* at 424-25. Michelle explained that she meant White was only sleeping at Broad Leaf, not trying to reconcile with Nicole. *Id.* at 425. Michelle also acknowledged that she listed her parents' address on Farragut Circle in Hamilton County on the marriage-license application even though she was "laying her head" at Overview (as were her children) and kept most of her belongings there; she explained that because she had called off the

17

engagement with White a couple of times, she considered her parents' house to be her "safe zone." *Id.* at 434, 436; *but see id.* at 444-45 (Michelle acknowledging on cross-examination that she had not previously mentioned—at the Recount Commission hearing, before the grand jury, or at sentencing—that she had called off the engagement with White a couple of times).

Nicole and her new husband Bill also testified at the post-conviction hearing. Nicole testified that she allowed White to stay at Broad Leaf "for a period of time" "after he moved out of Pintail[] and was looking for another home." *Id.* at 353. Nicole told White that he could not stay every day but he could stay "here and there" "until he found a place to live." *Id.* Bill, who worked out of state during the work week, said White had full access to the house, but he stayed in the basement. *Id.* at 397-98. Neither Nicole nor Bill could recall how often or when White stayed at their house.

White also presented the testimony of Ryan Harmon, a potential expert on cellular phones. The White family hired Harmon approximately four weeks before trial. Harmon had previously worked for the Indiana State Police, specializing in public-corruption cases. At the time of trial he owned his own consulting business regarding electronic surveillance and call-detail records. *Id.* at 62-63. Harmon, however, had numerous convictions, three of which were recent convictions (February 2013) for false informing. *See id.* at 109. According to Harmon, the number of days that White placed both his first and last calls of the day from the tower near Overview increased after his marriage to Michelle (which is when White claims to have moved to Overview). *Id.* at 98.

18

In December 2013 the post-conviction court entered findings of fact and conclusions of law denying White relief. Specifically, the court incorporated its August 2013 order that disposed of the eight freestanding claims of error. P-C App. p. 29. The court also denied White's claim regarding new evidence because "[a]ll of the evidence and witnesses cited in [White's] amended petition were available before and during trial. This automatically forecloses his claim under this section as a matter of law." *Id.* at 50. As for the remaining claims, the court separately addressed, and denied, each of White's ineffective-assistance-of-counsel claims. *Id.* at 29-48. White's sentence was again stayed pending appeal.

White now appeals. Both parties received permission to file oversized briefs in this case. Oral argument was held on December 9, 2014, in the Indiana Supreme Court courtroom.

### Discussion and Decision

In this case, White invoked the *Davis-Hatton* procedure, which is the termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a petition for post-conviction relief to be pursued in the trial court. *Kindred v. State*, 973 N.E.2d 1245, 1247 n.1 (Ind. Ct. App. 2012), *trans. denied*; *see also* Ind. Appellate Rule 37(A). Where, as here, the post-conviction relief petition is denied, the appeal can be reinstated. *Slusher v. State*, 823 N.E.2d 1219, 1222 (Ind. Ct. App. 2005). Thus, in addition to the issues raised on direct appeal, the issues litigated in the post-conviction-relief proceeding can be raised. *Id.* In other words, the direct appeal and the appeal of the denial of post-conviction relief are consolidated. *Id.*

19

White raises many issues on appeal, some of which are waived, *see* Ind. Appellate Rule 46(A)(8)(a), and others that we need not address due to our double-jeopardy analysis. What follows are White's remaining arguments, divided into direct-appeal and post-conviction issues.

## Direct-Appeal Issues

White raises a number of challenges on direct appeal, which we reorder and restate. First, he contends that the trial court should have dismissed certain charges against him. Second, he claims that the evidence is insufficient to support his conviction on Count 2, perjury. Third, he argues that the trial court erred in instructing the jury. Last, he alleges prosecutorial misconduct.

### A. *Motion to Dismiss*

White argues that the trial court erred by denying his motion to dismiss. We review the denial of a motion to dismiss for an abuse of discretion. *Gilliland v. State*, 979 N.E.2d 1049, 1058 (Ind. Ct. App. 2012) (citation omitted). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances or when the court has misinterpreted the law. *Id.* We may affirm the trial court's judgment if it is sustainable on any basis in the record. *Id.*

#### 1. Count 6: Perjury

Count 6 alleged that White committed perjury. At the time White was alleged to have committed the offense, Indiana Code section 35-44-2-1(a)(1) prohibited a person

from making "a false, material statement under oath or affirmation, knowing the statement to be false or not believing it to be true . . . ."[9] Count 6 alleged:

> [W]hite, on or about the 18th day of May, 2010 in the County of Hamilton, State of Indiana, did commit the offense of Perjury, to-wit: knowingly or intentionally making a false material statement under oath or affirmation, knowing the statement to be false or not believing it to be true, to-wit: stating on his marriage license application to the Hamilton County Clerk's Office and made under affirmation of the truth thereof, that his address was 7527 Broad Leaf Lane, Fishers, Indiana, when it was 13086 Overview Drive, 5B, Fishers, Indiana.

Appellant's App. p. 84 (charging information).

White's request to dismiss Count 6 was based in part on his argument that his residence address, as provided on his marriage-license application, was not material. *See* Appellant's Br. p. 23.

Materiality is an essential element of the offense of perjury. *Vandivier v. State*, 822 N.E.2d 1047, 1052 (Ind. Ct. App. 2005) (citing *Wilke v. State*, 496 N.E.2d 616 (Ind. Ct. App. 1986)), *trans. denied*. The trial court must make a preliminary determination of materiality when assessing the admissibility of the evidence. *See id.* (citations omitted). If the court finds that the evidence is admissible, it must then submit the issue to the jury for the jury to weigh the evidence and determine whether the State proved materiality beyond a reasonable doubt. *Id.* (citations omitted). "This Court has long recognized that if testimony alleged to be false is of no importance and immaterial it cannot be made the basis for a charge of perjury." *Richardson v. State*, 255 Ind. 655, 266 N.E.2d 51, 52 (1971).

---

[9] The statute criminalizing perjury has since been amended; it is now a Level 6 felony. *See* Ind. Code § 35-44.1-2-1(a).

21

In order to obtain a marriage license in Indiana, applicants must provide, among other things, their residence. *See* Ind. Code § 31-11-4-4(a). White listed Broad Leaf as his "Residence Address" on his marriage-license application:



State's Ex. 6.

Indiana Code section 31-11-4-3 provides that Indiana residents "who intend to marry must obtain a marriage license from the clerk of the circuit court of the county of residence of either of the individuals." While Indiana Code section 31-11-4-4(a) sets out the information that must be provided on a marriage-license application—including the applicants' residences—we agree with White that the only material portion of the residence information is the county of residence. Put another way, assuming that their application complied with all other relevant statutory provisions—and indeed it did—so long as either White *or* Michelle resided in Hamilton County, regardless of their street addresses, they would be able to obtain their marriage license. This is not to say, however, that applicants are free to provide false information on marriage-license applications. As the application above states, furnishing false information to a circuit-court clerk when applying for a

22

marriage license is a felony. *See* Ind. Code § 31-11-11-1. White, however, was not charged with furnishing false information; the prosecutors decided to charge him with perjury.

Because we conclude that White's street address was not material, we agree that the trial court should have dismissed Count 6. Because it did not, we remand to the trial court with instructions to vacate White's conviction on Count 6.

### 2. Count 7: Theft

Count 7 alleged that White committed theft pursuant to Indiana Code section 35-43-4-2. Count 7 provided:

> [W]hite, on or about the 5th day of November 2009 and continuing through the 28th day of September 2010 in the county of Hamilton, State of Indiana, did commit the offense of Theft, to-wit: by knowingly or intentionally exerting unauthorized control over the property of the Town of Fishers, Indiana, with the intent to deprive the Town of Fishers of any part of the value and use, to-wit: taking his pay as a . . . council member for Fishers Council District 2 during the period of approximately November 5, 2009,[10] through September 28, 2010,[11] when he did not reside in said Fishers Town Council district.

Appellant's App. p. 86 (charging information).

Indiana Code section 36-5-2-6(c) provides that "a member of the legislative body who is elected by the voters of the entire town but is elected or selected as a candidate from a district forfeits office if the member ceases to be a resident of the district." In addition, Indiana Code section 36-5-2-6.5(3) provides that a vacancy on a town legislative body is created when "a member ceases to be a resident of the town or district as set forth in Section 6 of this chapter." Citing these statutes, the State argues that White's town-council position

---

[10] This was the day White signed the Overview lease.

[11] White resigned his town-council position on September 21, 2010.

23

was vacant as of the moment White stopped residing at Broad Leaf; therefore, it could charge White with theft of his salary from that point forward.

These are not the only statutes dealing with town-council vacancies, however. When a vacancy is alleged "due to a reason set forth in IC 36-5-2-6.5(3)," Indiana Code chapter 5-8-5 is triggered. Ind. Code § 5-8-5-1. The chapter provides a public-meeting mechanism for determining when a vacancy occurs:

> (a) The town council may hold a public meeting to determine whether a circumstance has occurred under IC 36-5-2-6.5(3) that results in a vacancy on the town council. The town council may set a meeting for making the determination on its own motion, or a person may petition the town council to set a meeting to make the determination. The town council may grant or deny a petition for a meeting.

Ind. Code § 5-8-5-3(a). The chapter also provides that the town council may "vote to declare a vacancy in the town council membership" and that notice must be given to the town-council member who is the subject of the proceeding. Ind. Code § 5-8-5-4(a), (b). If the council determines that a vacancy exists, "the town clerk-treasurer shall give the circuit court clerk notice of the determination not later than five (5) days after the date of the town council's determination. The circuit court clerk shall give notice to the county chairman if a caucus is required under IC 3-13-11 to fill the vacancy." I.C. § 5-8-5-4(c).

Through Chapter 5-8-5, the legislature has provided a mechanism for town councils to declare and fill a vacancy. If we were to ignore the procedures provided by Chapter 5-8-5, we would violate our rules of statutory interpretation by essentially nullifying the entire chapter and the detailed procedures it provides. *See N. Ind. Bank & Trust Co. v. State Bd. of Finance*, 457 N.E.2d 527, 532 (Ind. 1983) ("[I]t is a rule of statutory interpretation that courts will not presume the legislature intended to do a

24

useless thing or to enact a statute that is a nullity."). We therefore read Sections 36-5-2-6(c) and 36-5-2-6.5(3) and Chapter 5-8-5 so that both have effect.

We agree with the State that pursuant to Sections 36-5-2-6(c) and 36-5-2-6.5(3), White forfeited his office when he began residing at Overview. It was therefore not legally improper for White to be charged with theft when he ceased to be a resident of District 2 but continued to draw his town-council salary. This is not to say that Chapter 5-8-5 has no purpose; town councils may utilize its procedures to fill vacancies. Here, however, the Fishers Town Council could not do so. As the jury found when it convicted White of theft, although White began residing at Overview in November 2009, he intentionally concealed his move, which allowed him to unlawfully and secretly maintain his town-council position. This concealment precluded the town council from implementing Chapter 5-8-5's procedures. The trial court did not err in denying White's request to dismiss Count 7.[12]

*B. Sufficiency of the Evidence*

White next claims that the evidence is insufficient to support his conviction for Count 2, perjury.[13] *See* Appellant's Br. p. 56-58.

Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency-of-the-evidence claim, this Court does not reweigh the evidence or judge the credibility of the witnesses. *Palilonis v. State*, 970 N.E.2d 713, 734 (Ind. Ct. App. 2012), *trans. denied*. We consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom and affirm if the evidence and those

---

[12] Notably, White does not challenge the sufficiency of the evidence underlying his theft conviction.

[13] White does not challenge the sufficiency of the evidence underlying his conviction on Count 4, voting in other precinct.

25

inferences constitute substantial evidence of probative value to support the verdict. *Id.* Reversal is appropriate only when a reasonable trier of fact would not be able to form inferences as to each material element of the offense. *Id.*

In order to convict White of Count 2, the State had to prove that he made "a false, material statement under oath or affirmation, knowing the statement to be false or not believing it to be true . . . ." Ind. Code Ann. § 35-44.1-2-1 (West 2012). Specifically, the State alleged that White made a false, material statement in February 2010 when he claimed his "Residence Address" was Broad Leaf on the form he submitted to change his voter registration. *See* Appellant's App. p. 76-77 (charging information).

Indiana law defines "residence" as the place:

(1) where a person has the person's true, fixed, and permanent home and principal establishment; and

(2) to which the person has, whenever absent, the intention of returning.

Ind. Code § 3-5-2-42.5.

The State presented sufficient evidence from which the jury could reasonably conclude that Broad Leaf was not White's residence when he said it was. This evidence included:

- White's September 2009 purchase agreement for Overview
- White's November 2009 lease agreement for Overview, signed after problems arose with closing
- White's statement that he would be moving into Overview in November 2009
- White's January 2010 mortgage application, on which he listed Overview as his present/mailing address and stated that he had been living at Overview for .2 years
- White's February 22, 2010 change-of-address form listing Broad Leaf as his address

26

- White's February 26, 2010 closing documents, in which he stated that Overview would be his primary residence within 30 to 60 days
- White's February 26, 2010 mortgage documents, in which he stated he had been living at Overview for .2 years
- White's homestead-deduction request for Overview, something he was entitled to only if he resided at Overview
- White's May 18, 2010 marriage-license application listing Broad Leaf as his Residence Address
- White's financial difficulties and the fact that he received $1000/month for serving as a town-council member
- Witness testimony that White was not living at Broad Leaf and that White did not stay at Broad Leaf overnight after his divorce
- Utility records from Overview, dating back to November 2009
- Cell-phone records showing White's presence at Overview
- White's statements to media that he had been "splitting time" between Broad Leaf and Overview beginning in November 2009

*See supra* p. 11-13. From this evidence, the jury could conclude that Broad Leaf was not White's residence when he listed it as such on his voter-registration form. The jury could likewise reasonably conclude that White knew Broad Leaf was not his residence yet said it was to maintain his town-council position. There is sufficient evidence to support White's perjury conviction.

### C. Jury Instructions

White next challenges jury instructions given at his trial. "The manner of instructing a jury is left to the sound discretion of the trial court." *Albores v. State*, 987 N.E.2d 98, 99 (Ind. Ct. App. 2013), *trans. denied.* When reviewing a trial court's decision to refuse or give jury instructions, this Court "considers: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions which are given." *Watson v. State*, 972 N.E.2d 378, 383 (Ind. Ct. App. 2012) (quoting *Gravens v. State*, 836 N.E.2d 490, 493 (Ind. Ct. App. 2005), *trans. denied*).

White challenges Final Instruction Number 18, which provided:

"Residence" means the place:

> (1) where a person has the person's true, fixed, and permanent home and principal establishment; and

> (2) to which the person has, whenever absent, the intention of returning.

Appellant's App. p. 42 (citing Ind. Code § 3-5-2-42.5).

White did not challenge Instruction 18 at trial.[14]  Generally, where a defendant fails to object to a jury instruction or fails to tender alternate instructions, the defendant's claim of error on appeal is waived; however, we will consider a defendant's argument that the error constituted fundamental error.  *Staley v. State*, 895 N.E.2d 1245, 1248 (Ind. Ct. App. 2008), *trans. denied.*  "The fundamental error doctrine is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process."  *Id.*

White concedes that Instruction 18, as given, was not error.  Appellant's Br. p. 41.  Indeed, the instruction is a verbatim recitation of Indiana Code section 3-5-2-42.5.  White instead argues that the instruction was incomplete: he claims the trial court should have provided the jury with a number of residency examples found in Indiana Code chapter 3-5-5. In particular, White argues that the jury should have received instructions on

---

[14] Although he did not object to Instruction 18, the State notes that White apparently offered an additional residency instruction pertaining to immediate family.  The State also notes that this instruction has not been preserved in the appellate record.  *See* Appellee's Br. p. 28.  The appropriateness of an immediate-family instruction is discussed below.

temporary residency, nontraditional residence, and residency based on immediate family. We disagree.

With respect to temporary residency, Indiana Code section 3-5-5-7 provides:

[A] person does not gain residency in a precinct into which the person moves for:

      (1) temporary employment;

      (2) educational purposes;

      (3) preparing to purchase or occupy a residence; or

      (4) other purposes;

without the intent of making a permanent home in the precinct.

As for nontraditional residence, Indiana Code section 3-5-5-18 provides that "an individual with a nontraditional residence whose residence is within a precinct, but is not fixed or permanent, resides in that precinct." White fails to explain how the statutory provisions for temporary residency and nontraditional residence applied to him based on the evidence presented at trial. In fact, at oral argument, White's attorney conceded that there was no evidence at trial to support the giving of these additional instructions. *See* Oral Arg. at 52:50 *available at* http://goo.gl/MaLuCp (Chief Judge Vaidik: "What evidence was presented [at trial] that supported . . . that his Broad Leaf residence was either a nontraditional or temporary residence, other than the fact that his son lived there with his ex-wife and her now-husband?" White's attorney: "Well due to the ineffective assistance of counsel, there is none."). We therefore cannot say that these additional examples should have been presented to the jury. *See Watson*, 972 N.E.2d at 383 (when reviewing a trial court's decision to give jury instructions, this Court considers whether there is evidence in

29

the record to support the giving of the instructions). Additionally, the temporary residency and nontraditional-residence provisions were broadly covered by the language of Instruction 18. *See id.* (when reviewing a trial court's decision to give jury instructions, this Court also considers whether the substance of the tendered instruction is covered by other given instructions).

Regarding the immediate-family provision, Indiana Code section 3-5-5-11, White argues that his "immediate family, his son, permanently residing at [Broad Leaf] created a rebuttable presumption of residence for White at [Broad Leaf]." Appellant's Br. p. 46.

Section 3-5-5-11 provides:

The place where a person's immediate family resides is the person's residence, unless the family's residence is:

     (1) a temporary location for the person's immediate family; or

     (2) for transient purposes.

Pursuant to Indiana Code section 3-5-5-0.5, White's son does qualify as immediate family. But White's argument that Section 3-5-5-11 applies to him is not persuasive because he is divorced, and White's son lives with White's ex-wife and her new husband. We cannot imagine that the legislature intended Section 3-5-5-11 to apply in such a situation.[15]

We cannot say that the trial court committed any error—much less fundamental error—with respect to Instruction 18.

### D. Prosecutorial Misconduct

---

[15] Moreover, Indiana Code section 3-5-5-13 provides that if a person is "living at a place other than the residence of the person's immediate family" and "has the intention of remaining at that place and engages in conduct to carry out that intent; the place where the person lives is the person's residence."

30

White contends that the State committed numerous instances of prosecutorial misconduct. Because White did not object at trial, he claims fundamental error.

In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he would not have been subjected otherwise. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014), *reh'g denied*. A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. *Id.* "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by *the probable persuasive effect* of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct." *Id.* (quotation omitted). To preserve a claim of prosecutorial misconduct, the defendant must—when the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial. *Id.*

Our standard of review is different where, as here, a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court, that is, waived for failure to preserve the claim of error. *Id.* The defendant must establish not only the grounds for prosecutorial misconduct but also that the prosecutorial misconduct constituted fundamental error. *Id.* at 667-68. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." *Id.* at 668. In evaluating the issue of fundamental error, we must

31

look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *Id.*

White raises numerous instances of prosecutorial misconduct on the part of Dowd, Sigler Sr., and Sigler Jr; however, we find that White has failed to establish not only the grounds for prosecutorial misconduct but also that the misconduct constituted fundamental error.

First, White argues that the State committed prosecutorial misconduct when it argued during opening and closing that White "immediately" forfeited his town-council position when he stopped residing at Broad Leaf, which was a misstatement of the law. This argument impacts Count 7, theft of White's town-council salary. The prosecutor did not misstate the law; as we explained previously, pursuant to Indiana Code sections 36-5-2-6(c) and 36-5-2-6.5(3), White forfeited his office when he began residing at Overview. *See supra* p. 23-25.

Second, White argues that the State committed prosecutorial misconduct "throughout trial" when it argued that White was not "living" at Broad Leaf, as opposed to using the residency standards found in Indiana Code chapter 3-5-5. Appellant's Br. p. 73. White, however, provides only one example from the State's closing argument: "You can't vote someplace where you don't live." Tr. p. 1098. This lone example does not establish prosecutorial misconduct, especially since a person's physical presence is one of the factors

32

used to determine residency. *See State Election Bd. v. Bayh*, 521 N.E.2d 1313, 1318 (Ind. 1988).

In a related argument, White appears to suggest that the State did not make a good-faith argument that he lived at Overview based on post-conviction exhibits showing that White received mail at Broad Leaf. *See* P-C Ex. 24-25. However, the exhibits he relies on were not admitted at trial. *See Gasper v. State*, 833 N.E.2d 1036, 1042-43 (Ind. Ct. App. 2005) ("While a prosecutor may argue both law and facts and propound conclusions based on his or her analysis of the evidence, *the prosecutor must confine closing argument to comments based only upon the evidence presented in the record*." (emphasis added)), *trans. denied*. Accordingly, the State did not commit prosecutorial misconduct on this basis. Also, contrary to White's argument, the State did not argue that White had "no right" to be at Broad Leaf; rather, the State argued that White had "no legal right" to live there because he quitclaimed his interest in the marital residence on Broad Leaf to Nicole one month after their divorce. *See* Tr. p. 1031.

Third, White argues that the State committed prosecutorial misconduct by stating that White received his Krieg DeVault paycheck at Overview, which was based on the trial evidence that White provided that address for employment purposes. Although post-conviction testimony later indicated that Krieg DeVault issued electronic—not paper—paychecks, P-C Tr. p. 568, the available trial evidence supported the State's argument. To the extent White argues that the State improperly summarized the evidence regarding other mail that he received at Overview, the trial record shows that White provided the Overview address for water and electric utilities, received his Krieg DeVault acceptance letter at

33

Overview and gave them his Overview address for purposes of employment forms, and provided the address to his landlord for the purpose of receiving notices. State's Ex. 8, 11, 17, 41, & 42. The State did not commit prosecutorial misconduct regarding White's mail.

Fourth, White argues that the State committed prosecutorial misconduct by stating that he sought a homestead deduction for Overview. This assertion, however, was supported by the trial evidence, including the testimony of the loan closer and White's Indiana Sales Disclosure Form. The form was signed by White on February 26, 2010, and stamped as filed by the Hamilton County Auditor on March 3, 2010. State's Ex. 26, p. 3. On the form, White indicated that he was using Overview as his "primary residence" and was applying for the homestead deduction. *Id.*, p. 1. Although at the post-conviction hearing White presented a "receipt" suggesting that he did not receive a homestead deduction, *see* P-C Ex. 33 (detachment portion of Sales Disclosure Form stamped as filed by Hamilton County Auditor on March 8, 2010), this evidence was not presented at trial. Therefore, the State did not commit prosecutorial misconduct with respect to the homestead deduction.

Fifth, White argues that the State committed prosecutorial misconduct concerning State's Exhibit 18, an email from a mortgage counselor regarding White's FHA loan for Overview. White claims that the email was "irrelevant" to his Overview mortgage, because it said White was not eligible for a tax credit because he did not occupy Broad Leaf as his primary residence. Appellant's Br. p. 74. The State's brief discussion of this email during closing, which it used to transition into the definition of residence, Tr. p. 1035, does not amount to prosecutorial misconduct.

34

Sixth, White argues that the State committed prosecutorial misconduct regarding the cellular records. It is true that the State argued that the cellular records "put" White at Overview; however, these statements occurred after the State had already explained that White's presence at Overview was a reasonable inference based on the calls made from Tower 074, the tower closest to Overview. *See* Tr. p. 1036. The State did not argue that the cellular records showed an exact location; rather, the limits of such evidence were well established at trial. *Id.* at 969-70 (records showed the caller's "general area").

Finally, White argues that the State misled the jury by not providing accurate coverage maps. The State admitted a map that showed the location of the towers, but not the coverage area of those towers. *See* State's Ex. 57; Tr. p. 956 (Sprint witness identifying "IN03XC114" on the map as Tower 074 and "IN03XC105" on the map as Tower 07). However, the State admitted evidence explaining the coverage area of those towers. Specifically, the Sprint witness testified that when a call is placed, the cell phone generally reaches the closest tower. The witness explained that the effective range of each tower was two miles or less, depending upon urban density. Tr. p. 960.

White presented his own coverage map at the post-conviction hearing, which he claimed was more "accurate" than the State's trial map. *See* P-C Ex. 3. This, however, does not prove that the State committed prosecutorial misconduct at trial.[16]

### E. Double Jeopardy

---

[16] To the extent White argues that "non-triangulated cell data depicting coverage areas only when a phone is used" should not be used to determine domicile in White's case and all future residency contests, we decline to address this for lack of cogent argument. Appellant's Br. p. 76 (emphasis omitted).

Although White did not raise this claim on appeal, we address whether his convictions on Counts 1 and 2, as well as on Counts 4 and 5, violate Indiana's prohibition against double jeopardy. We raise this issue sua sponte because a double-jeopardy violation, if shown, implicates fundamental rights. *Smith v. State*, 881 N.E.2d 1040, 1047 (Ind. Ct. App. 2008) (citation omitted).

Conviction of two or more offenses violates the double-jeopardy clause of the Indiana Constitution "if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999). Beyond constitutional double jeopardy, other categories of double jeopardy based on statutory construction and common law prohibit multiple convictions or punishments for the same crime. *Guyton v. State*, 771 N.E.2d 1141, 1143 (Ind. 2002). As it pertains to White's case, these categories prohibit "[c]onviction and punishment for a crime which consists of the very same act as another crime for which the defendant has been convicted and punished," as well as "[c]onviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished." *Id.* (quoting *Richardson*, 717 N.E.2d at 56 (Sullivan, J., concurring)).

We find two double-jeopardy violations here. First, with respect to Counts 1 and 2, White was convicted and punished for the very same act—making a false statement regarding his address on the form he used to change his voter registration:

Count 1: Class D felony submission of a false, fictitious, or fraudulent voter's registration application for "knowingly or intentionally sending a voter

36

registration change[-]of[-]address form to the Hamilton County Board of Voter Registration [in February 2010] representing his new address was 7527 Broad Leaf Lane . . . when he knew he was or would be living at 13086 Overview Drive . . . at the time of the next election (May Primary 2010)."

Count 2: Class D felony perjury for "knowingly or intentionally making a false material statement under oath or affirmation knowing the statement to be false or not believing it to be true . . . on his State Voter's Registration Change Form [in February 2010] stating his residence was changing from 6994 Pintail Drive . . . to 7527 Broad Leaf Lane . . . when in fact at the time of making said statement he was residing at 13086 Overview Drive . . . ."

Appellant's App. p. 74-77 (charging information).[17]  At oral argument, the State appeared to admit that these convictions violate double jeopardy.  *See* Oral Arg. at 32:13, *available at* http://goo.gl/MaLuCp (Chief Judge Vaidik: "In any event, when we're talking about applications we're talking about Count 1, which is submitting the fraudulent application to the voter-registration board, and Count 2, is the same application, is it not, that was submitted to the voter-registration board and it was charged as perjury.  So are those two counts double jeopardy?"  The State: "[T]hey very well may be . . . this is not something that they brought in their appeal, but [] you're right it is the same fact, it is the same application we're dealing with . . . .").  Because Counts 1 and 2 violate double-jeopardy principles, we remand to the trial court with instructions to vacate White's conviction on Count 1.[18]

---

[17] Counts 1 and 2 use different dates—February 22 and 23.  *See* Appellant's App. p. 74-77. However, they are referencing the same document, State's Exhibit 46.

[18] Although we vacate White's conviction on Count 1, we find it necessary to note one of White's arguments regarding this conviction.  Citing Indiana Code section 3-14-3-1.1(1), the trial court instructed the jury that it could convict White of Count 1 if he knowingly submitted a single materially false, fictitious, or fraudulent voter-registration application.  At trial and on appeal, White argued that the statute requires multiple materially false, fictitious, or fraudulent applications, and for this reason, he should not have been convicted of Count 1.  In response, the State argued that interpreting Section 3-14-3-1.1 to require more than one application would lead to absurd results and excuse a legitimate instance of voter fraud.  Section

Counts 4 and 5 also violate double jeopardy. Both punish White for the very same act—the act of voting in the May 2010 primary election in Delaware Township when he lived in Fall Creek Township:

> Count 4: Class D felony voting in other precinct in May 2010 for "knowingly or intentionally voting in Delaware Township Precinct 12 indicating his residence was 7527 Broad Leaf Lane . . . when in fact he resided at the time at 13086 Overview Drive . . . , which is located in Fishers Fall Creek Township Precinct 5."
>
> Count 5: Class D felony procuring, casting, or tabulating a false, fictitious, or fraudulent ballot in May 2010 for "knowingly or intentionally casting a vote . . . in the Delaware 12 Precinct when he was residing in . . . Fall Creek Township No. 5 Precinct (13086 Overview Drive)."

Appellant's App. p. 80-83 (charging information). As with Counts 1 and 2, the State appeared to concede at oral argument that these convictions violate double jeopardy. Oral Arg. at 28:30, *available at* http://goo.gl/MaLuCp (Chief Judge Vaidik: "Is casting a ballot, Count 4, and Count 5, voting . . . are those convictions [] double jeopardy?" The State: "I think they very well may be; they didn't raise that issue in this appeal . . . but they do seem to be based on the same acts."). Because Counts 4 and 5 violate double-jeopardy principles, we remand to the trial court with instructions to vacate White's conviction on Count 5.[19]

## II. Post-Conviction Issues

---

3-14-3-1.1, which speaks of applications and ballots, is indeed written in the plural. The legislature may wish to consider amending this section.

[19] Although we vacate White's conviction on Count 5, we note a problem with the relevant statute. At the post-conviction hearing, there was testimony that Hamilton County used a MicroVote Infinity direct-record electronic voting system in the May 2010 primary election. According to White, this electronic voting system does not utilize a paper ballot, ballot card, or ballot label, meaning it does not use a ballot as currently defined by Indiana Code section 3-5-2-3. As the State pointed out at oral argument, the statute has yet to be amended to account for new voting technology. Given the likelihood that electronic voting systems will be used with increasing frequency in the future, the legislature should amend Section 3-5-2-3's definition of ballot to be more inclusive.

Post-conviction proceedings provide a narrow remedy to raise issues that were not known at the time of the original trial or were unavailable on direct appeal. *Garrett v. State*, 992 N.E.2d 710, 718 (Ind. 2013). The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Garrett*, 992 N.E.2d at 718. When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Garrett*, 992 N.E.2d at 718. To prevail from the denial of post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.*

White contends that Attorney Brizzi was ineffective. To establish a post-conviction claim alleging violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* First, a defendant must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed to the defendant by the Sixth Amendment. *Id.* Even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or most effective way to represent a client; therefore, under this prong, we will assume that counsel performed adequately and defer to counsel's strategic and tactical decisions. *Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002), *reh'g denied*. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id.*

Second, a defendant must show that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. To establish prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.*

These prongs are "separate and independent inquiries," and a petitioner's "failure to establish either prong will cause the claim to fail." *State v. Greene*, 16 N.E.3d 416, 419 (Ind. 2014) (quotation omitted).

*A. Discussion of Jury Nullification during Voir Dire*

White first contends that Attorney Brizzi was ineffective because he discussed jury nullification during voir dire: "Telling jurors they could disregard the law, even in *voir dire*, was unreasonable considering there was a strong probability that it implied [he] violated a law." Appellant's Br. p. 61. White claims that Attorney Brizzi was essentially telling the jurors that they could "acquit [him] because it was a selective prosecution and/or the punishment was too severe for technical violations." *Id.*

Jury nullification is the jury's "knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." Black's Law Dictionary 989 (10th ed. 2014). Our Supreme Court has made clear that Indiana juries do not have a broad, general nullification power in criminal cases. *Walden v. State*, 895 N.E.2d 1182, 1184 (Ind. 2008). During voir dire, Attorney Brizzi discussed playing poker for nickels, failing to obtain city

40

permits, and a paraplegic who possessed a large quantity of pain pills being convicted of drug trafficking. Tr. p. 614, 615, 616-17. Attorney Brizzi testified during the post-conviction hearing that he discussed these "potential situations . . . where maybe somebody is singled out unfairly" because his "hope was sort of planting this seed because 12 people have to unanimously agree that the State met their burden." P-C Tr. p. 239.

In its order denying post-conviction relief, the post-conviction court found that Attorney Brizzi did not employ a jury-nullification theme or defense at trial and therefore he was not ineffective on this basis:

> a. "Jury nullification" was never employed as a theme or defense in the trial of this cause. Beyond two or three short examples cited during a very brief portion of jury selection, there is little or no other reference or resort to "jury nullification" in the trial court. In support of this finding, the [C]ourt has reviewed the testimony of Brizzi and White at the P.C.R. hearings and also reviewed the trial transcript. Specifically, the Court has looked to Counsel Brizzi's entire jury selection presentation, opening statements, cross-examination of witnesses, arguments to the [C]ourt and closing arguments. The [C]ourt finds no other statements which reasonably could be said to employ a "jury nullification" theme.
>
> \*   \*   \*   \*   \*
>
> c. Attorney Brizzi testified under direct and cross-examination that he was specifically testing jurors for their reactions to certain ideas that may (or may not) have arisen at trial and that the potential for using nullification could have potential application. Ultimately, however, the tactical decision made by [White] and his counsel was to argue that the State had not met its burden.
>
> d. Given that there was only a brief mention of the idea of nullification to an unsworn portion of the panel of potential jurors, this Court can find no prejudicial incrimination in violation of the Constitutional protections against self-incrimination.
>
> e. Although this Court need not reach the issue of the appropriateness of employing a jury nullification theme (because none existed in this case), the Court would note the longstanding use of such a defense as a matter of sound trial strategy in certain criminal cases.

41

f. Finally, [White] has not demonstrated how brief references to nullification poisoned the minds of the jury such that a fair trial could not be had.

P-C App. p. 1949.

We agree that Attorney Brizzi's defense at trial was not jury nullification; rather, he discussed three brief examples during voir dire to test the waters in light of the State's evidence that White was living at Overview at the same time that he claimed Broad Leaf as his address. Furthermore, White has made no showing that the result of the trial would have been different without the comments. Accordingly, Attorney Brizzi was not ineffective on this ground.

### B. Failure to Prepare or Present a Defense

After the State presented its case-in-chief, the defense unexpectedly rested without presenting any evidence. *See* P-C Tr. p. 184 (Attorney Brizzi: "[The State was] surprised that we had rested. I did watch them sort of scramble there at the end to try to figure out what was going on."). White contends that Attorney Brizzi was ineffective for not preparing or presenting a defense. White argues that Attorney Brizzi should have called his wife Michelle, his ex-wife Nicole, Nicole's husband Bill, his mother Peggy White Uskert, his cell-phone expert Harmon, and White himself as witnesses at trial and that Attorney Brizzi should have admitted the mail that he received at Broad Leaf. White also argues that Attorney Brizzi's "lack of preparation resulted in an unreasonable decision to present no evidence." Appellant's Br. p. 67.

Trial counsel's strategy to put the State to its burden and not present a defense, like other strategic decisions, is a legitimate trial strategy. *Rondon v. State*, 711 N.E.2d 506,

42

520 (Ind. 1999). In addition, it is not unreasonable to change strategy during the course of trial because "as a trial unfolds, events occur, some unexpected, that counsel must react to in real time." *McCullough v. State*, 973 N.E.2d 62, 76 (Ind. Ct. App. 2012), *trans. denied*. The determination of whether a defendant should testify is a matter of trial strategy. *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998). We will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best. *Id.*

Attorney Brizzi spent "hundreds and hundreds and hundreds of hours on this case." P-C Tr. p. 219. Attorney Brizzi testified at the post-conviction hearing that his initial strategy was to put on some witnesses to establish that White had been living at Broad Leaf. *Id.* at 285. According to Attorney Brizzi, "[i]f all had gone well," he would have called "Charlie, Nicole, Michelle, and Bill and maybe Ryan [Harmon]." *Id.* at 210. He never intended to call Peggy. *Id.* at 245. But when Attorney Brizzi realized that he could not call those witnesses, he switched to the strategy that the State had not met its burden of proof. *Id.* at 285. Specifically, when Attorney Brizzi was preparing Michelle for her trial testimony 48-72 hours before the close of the State's case-in-chief, Michelle blurted out in response to Attorney Brizzi's fairly aggressive cross-examination question that White "really didn't live there, live there," referring to Nicole's house on Broad Leaf. *Id.* at 208. Attorney Brizzi told White that if that happened on cross-examination, he would be "sunk."

43

*Id.* So they decided that "we not only couldn't call Michelle, but that we [also] couldn't call Nicole or her husband."[20]  *Id.*

Attorney Brizzi decided not to call White because he could not control White's testimony on the stand, and "it would have been, in [his] professional opinion, a disaster." *Id.* at 217; *see also id.* at 219.  Attorney Brizzi also decided not to call Harmon because he was satisfied with his cross-examination of the State's cell-phone expert, Harmon presented ethical problems, and the State would have "destroy[ed]" Harmon on cross-examination.  *Id.* at 265-66, 291.  As for White's allegation that Attorney Brizzi should have prepared his witnesses *before* trial as opposed to *during* trial, Attorney Brizzi testified that he had "been doing this for 20 years" and he always "prepare[s] [his] witnesses right before they're about to testify."  *Id.* at 213.  Attorney Brizzi continued,

> This is the only jury trial I've ever lost.  My witnesses, when they take the stand to testify, are prepared to testify.  I don't want to get into a debate . . . about when the State closed and when I was going to prepare [the witnesses].  At that time [at least 48 hours before the State closed], I felt like I had adequate time to prep both Nicole and Michelle to testify if that was, in fact, going to happen.

*Id.* at 234; *see also id.* at 254.  Finally, Attorney Brizzi explained that he did not admit the stipulated evidence—the mail that White received at his ex-wife's house on Broad Leaf— because "at that time, our trial strategy had significantly changed from what it had been three or four days prior, and, number one, I didn't want the chance for the State to come back on rebuttal, because I think they were surprised that we had rested."  *Id.* at 184.

---

[20] Attorney Brizzi testified that on his way home that night, he called and sought advice from his former law partner, whom he described as his "little Jiminy Cricket, because he was always the partner who was . . . saying . . . we can do this, but we can't do that."  P.C. Tr. p. 335.  Attorney Brizzi's former partner agreed that Attorney Brizzi should not call Michelle as a witness.  *Id.*  In addition, Attorney Brizzi consulted his wife, also an attorney, who likewise agreed.  *Id.*

Attorney Brizzi also believed that the mail "cut both ways," especially without any

witnesses to explain it. *Id.*

> The post-conviction court found:
>
> Brizzi's preparation for trial was appropriate and extensive. The testimony of Brizzi, coupled with the defense exhibits and e-mails between the lawyer and client[,] indicate an amicable working relationship and multiple tactical conversations.
>
> Brizzi was in constant communication with [White] throughout the pendency of the action. In addition, counsel sought the input of other lawyers and experts as he prepared [White's] case, conducted an informal focus group and checked his assessment of strategy and tactics with other trusted lawyers.
>
> \*    \*    \*    \*    \*
>
> Brizzi gave an appropriate opening statement indicating clearly that the responsibility for proof lay with the State of Indiana and that they would be unable to meet that burden.
>
> [Brizzi] conducted an efficient and thorough cross-examination of the State's witnesses according to the Court's review of the trial transcript.
>
> There were numerous, significant testimonial problems for each of the witnesses [White] claims should have been called to testify at trial. Cumulatively, the effect of these credibility problems would have done more harm than good had these witnesses taken the stand.
>
> [White], for example, gave multiple pre-trial statements to the press which Brizzi testified made calling White as a witness exceedingly difficult. In an attempt to determine if calling [White] at trial was a good idea, Brizzi arranged an interview in a tightly controlled setting and described [his] performance as "disastrous."
>
> As noted more specifically below, Michelle White indicated in preparation for her trial testimony that "Charlie didn't live there, live there," when referring to [White's] claims to reside at [Broad Leaf]. This was the first time such a statement had been made and Brizzi was thus placed in the untenable position of suborning perjury or subjecting Michelle White to a potentially damaging cross examination.

45

Michelle White's value as a witness was suspect at best: having given multiple statements under oath and having, apparently, been less than truthful about her residence on her own application for marriage license, there was a serious and significant tactical risk to calling her to the stand.

Nicole Mills, beyond repeating that White had access to her home and could stay there[,] did not, in this Court's review, ever offer a definitive statement on when or if he stayed there with any frequency. When asked this question by the State on cross-examination, she agreed that she could not—and in fact had not—ever made such an estimate in any proceeding relative to this case. Further, Brizzi testified that he remained concerned during trial that this ambiguity would make her a favorable State's witness.

Nicole Mills's reluctance or inability to specify dates, times or periods in which [White] lived at [Broad Leaf] made her testimony as difficult as Michelle White's.

Brizzi testified that by not being able to call Michelle White, having Nicole Mills testify could create a serious perception problem in the minds of the jury.

Brizzi was also aware of potentially serious credibility problems for Ryan Harmon had he been called to testify.

[White] was aware, according to both the testimony of Brizzi and the e-mail submitted at the hearing on October 21, 2013, that there was a strong possibility Harmon would not be called. The Court concludes that this was not a matter of surprise for [White].

A review of the e-mail . . . shows that Brizzi made a great many of the points requested by [White] in his cross-examination of the State's telephone[-]records witness.

The Court can ascribe no legal or strategic value to the testimony of Peggy White Uskert, William Mills or Tim Wilcox[21]; further, there was no indication of how their testimony would have altered the outcome of this case.

P-C App. p. 1939-40. As for White's post-conviction testimony, the post-conviction court

made the following findings:

_____

[21] Tim Wilcox was a private investigator White hired to assist with the case. P-C App. p. 1937.

White indicated he was a lawyer but had no experience as a criminal lawyer. . . .

White expressed satisfaction with Brizzi's representation well into the trial of the case and agreed he was satisfied with relying on Brizzi's judgment in making case decisions.

*     *     *     *     *

White had doubts about testifying himself. White ultimately reached no conclusion on testifying but "thought maybe I should" near the end of the trial. He ultimately concurred in Brizzi's decision not to call him and admitted he did not insist on testifying.

White did not complain about Brizzi's trial strategy during an interview after his conviction and acknowledged that he only decided to pursue post-conviction relief after consulting with an appellate lawyer.

White expressed no frustration at his sentencing hearing with the decisions not to call witnesses or present evidence.

White acknowledged the State's trial evidence: [White] admitted listing Overview Drive as his place of residence on his Uniform Residential Loan application for his Overview mortgage and further admitted signing a promise under oath to reside in his Overview condominium per FHA requirements.

White gave his employer, Krieg De[V]ault, the Overview Drive address as his place of residence in January 2010[,] and [he] directed his last DNR paycheck to his Overview Drive address during the time he claimed to be receiving his mail and residing at [Broad Leaf].

*     *     *     *     *

White was aware of credibility issues with Ryan Harmon and that Brizzi did not want to call him. Moreover, White heard Brizzi's judgment that his cross examination of the State's cell[-]phone witness and concurred in that decision.

In a post-sentencing television interview, White stated he "wanted to put on a case" but concurred with Brizzi in not calling witnesses. The rationale for this tactical decision was because ". . . we did not believe the State had met its burden."

47

*Id.* at 1941-42. Regarding the mail that White wanted Attorney Brizzi to enter into evidence, the post-conviction court found:

> White entered a large volume of personal mail he received at [Broad Leaf] during the time period relevant to the criminal case. It included bills, some tax documentation, and junk mail.
>
> The court does not find this conclusive as to the issue of residence and of arguable evidentiary value. Brizzi testified that the presentation of the mail in evidence could "cut both ways" were it introduced and the court acknowledges and adopts this interpretation.

*Id.* at 1942.

The post-conviction court concluded that White had failed to prove both prongs of *Strickland.* We agree. Regarding deficient performance, as the post-conviction court concluded, each of White's proposed witnesses "was fraught with pitfalls." *Id.* at 1943. Michelle had the potential to be a damaging witness against her own husband regarding whether White lived at Broad Leaf,[22] and Nicole and Bill were unable to specify when White spent the night at their house on Broad Leaf. And it was a risk to put White on the stand given his demeanor and commentary both before and during trial. Moreover, at the

---

[22] White argues that the post-conviction court erred in ruling that Attorney Brizzi was reasonable in not calling Michelle as a witness because the post-conviction court used "an incomplete *segment* of her testimony." Appellant's Br. p. 66. Specifically, White claims that Michelle actually said that "Charlie really didn't live there, live there *in that sense*," which meant that White was living at Broad Leaf, but not to reconcile with Nicole. *Id.* (emphasis added). However, the post-conviction court found that Michelle told Attorney Brizzi before trial that "Charlie didn't live there, live there" and that her value as a witness was "suspect at best." P-C App. p. 1940. We defer to a post-conviction court's factual findings.

In addition, White claims that the post-conviction court erred in sustaining an objection to Michelle's post-conviction testimony. Specifically, White's attorney asked Michelle if she intended to "abandon" her "residence" at her parents' house on Farragut Circle in Hamilton County when she signed the marriage-license application (even though she was actually living at Overview at the time). P-C Tr. p. 454. The State objected on the grounds that it called for a legal conclusion, and the post-conviction court sustained the State's objection. On appeal, White asks us to take judicial notice of Michelle's testimony before the Recount Commission and to unseal and take judicial notice of her testimony before the grand jury. Even assuming that Michelle intended to retain her residency at her parents' house until she married White, White fails to explain how this entitles him to relief. We therefore decline to take judicial notice.

48

post-conviction hearing White agreed with Attorney Brizzi's decision not to call him as a witness. Regarding Harmon, Attorney Brizzi was able to make many of the points he needed to make about White's cell-phone calls during his cross-examination of the State's cell-phone expert. Plus, Harmon had credibility issues given his own criminal history.

Regarding the mail,[23] the post-conviction court concluded:

> Receiving mail at one address while residing at another is not qualitatively different than having a post office box where one receives their mail. While the mail was certainly an indicator that White received bills and correspondence there and would occasionally pick it up, nothing offered by [White] suggested his actual residence at that location during the relevant period. In point of fact, a review of the trial record and transcript appears to indicate that [White] interchanged the use of [Broad Leaf] Lane and Overview Drive as mailing addresses depending on whether he wanted to have a document remain private (Overview) or public ([Broad Leaf]).[24]

*Id.* at 1945. Attorney Brizzi testified at the post-conviction hearing that he was concerned that the State would use White's mail to help prove its own case. As the State argued in its brief and at oral argument, some of the Broad Leaf mail involved preexisting accounts on which White was not changing his address, *see* Oral Arg. at 44:45, *available at*

---

[23] White makes a one-sentence argument that Attorney Brizzi should have admitted White's "receipt" showing that he did not "claim[]" a homestead deduction for Overview, which would arguably support his claim that he did not reside there. Appellant's Br. p. 67 (citing P-C Ex. 33). The State responds that White's signed Indiana Sales Disclosure Form shows that he applied for the homestead deduction by virtue of the checked box, State's Ex. 26, and the loan closer testified at trial that White applied for the homestead deduction. Tr. p. 798. Even if White did not receive a homestead deduction for Overview, this evidence is not sufficient to prove ineffective assistance of counsel.

[24] As for private documents, Krieg DeVault sent its employment offer to White at Overview, and White received his final paycheck from DNR in February 2010 at Overview. In addition, when filling out the mortgage applications for Overview in January and February 2010, White listed Overview as both his "Present" and "Mailing" addresses.

As for public documents, when White filled out an address change with the Hamilton County Board of Voter Registration in February 2010, he changed his address from the Pintail apartment to Broad Leaf. White then voted in the May 2010 primary election using Broad Leaf and filed his Declaration of Candidacy the following week using Broad Leaf. White also listed Broad Leaf as his "Residence Address" when submitting an application to marry Michelle in May 2010.

49

http://goo.gl/MaLuCp, and some of the mail was still addressed to the Pintail apartment but was being forwarded to Broad Leaf. *See* P-C Ex. 24 (bundle of White's mail).

With regard to Attorney Brizzi switching strategies in the middle of trial, he explained:

> [A]t that moment [when Michelle said "Charlie really didn't live there, live there"] I no longer believed that Charlie was living at Broad Leaf. And so my entire trial strategy at that point shifted to the State can't meet their burden, and many of the decisions about not putting the stipulated exhibits on and calling additional witnesses is because I was terrified of what they were going to do in rebuttal, because I think I did catch them . . . off guard when we rested without even calling Harmon.

P-C Tr. p. 257-58. Given "the very difficult situation in which Attorney Brizzi found himself at trial," P-C App. p. 1943, White has failed to show that Attorney Brizzi's representation fell below an objective standard of reasonableness and that Attorney Brizzi made errors so serious that he was not functioning as "counsel" guaranteed to White by the Sixth Amendment. Even White agreed in a post-sentencing television interview that he endorsed Attorney Brizzi's position and defense. *See id.* at 1944.

Regarding prejudice, the post-conviction court concluded, and we agree, that White "cannot point to a single piece of evidence or witness which would have swayed the outcome of the jury's decision. Nothing in the testimony of the witnesses he produced in the post-conviction evidentiary hearings challenged this Court's confidence in the outcome or the process which produced it." *Id.* at 1945. White has not shown that there is a reasonable probability that the result of the proceeding would have been different. Attorney Brizzi's decision not to call witnesses, not to admit mail, and to change strategies during trial appears to have given the jury a lot to think about, as they deliberated for

50

thirteen hours before convicting White of six of the seven counts. *See* P-C Tr. p. 322 (Sigler Sr.: "And of the case[s] you tried as a prosecutor, if a jury was out more than five or six hours, . . . where would your mind go?" Attorney Brizzi: "I'd be worried."). White has failed to prove that Attorney Brizzi was ineffective for not preparing or presenting a defense.

### C. Jury Instructions and Failure to Object

White contends that Attorney Brizzi was ineffective because he did not object to Instruction 18 and then propose "complete residency instructions." Appellant's Br. p. 68-69. White also raised this issue above in the context of fundamental error.

The bar establishing fundamental error is higher than that for prejudice of ineffective assistance of trial counsel. *See Benefield v. State*, 945 N.E.2d 791, 804, 805 (Ind. Ct. App. 2011) ("[A] finding on direct appeal that no fundamental error occurred does not preclude a post-conviction claim of ineffective assistance of trial counsel."). In other words, it is easier for a defendant to prove the prejudice prong of an ineffective-assistance-of-counsel claim than it is to prove fundamental error. But as our Supreme Court recently observed, "Although fundamental-error and ineffective-assistance-of-counsel claims are different, they often yield the same result." *Ryan*, 9 N.E.3d at 668 n.4 (quotation omitted).

We determined above that the trial court did not commit fundamental error in giving Instruction 18; indeed, it is a verbatim recitation of Indiana Code section 3-5-2-42.5. We likewise conclude that Attorney Brizzi was not ineffective for failing to object to it. In addition, we conclude that Attorney Brizzi was not ineffective for not supplementing Instruction 18. White claims that Attorney Brizzi should have provided the jury with a

51

number of residency examples found in Indiana Code chapter 3-5-5; however, he fails to establish that any of these statutory provisions applied to him based on the evidence presented at trial. To the extent White argued at oral argument that Attorney Brizzi was ineffective for failing to present evidence at trial that would have supported giving the jury the residency examples found in Chapter 3-5-5, we have already concluded that Attorney Brizzi was not ineffective for not presenting the evidence that White now claims he should have presented.[25] More importantly, these examples were essentially covered by the language of Instruction 18. And to the extent that White argues that Attorney Brizzi should have instructed the jury based on "*Bayh*" and "*Evrard*," *see* Appellant's Br. p. 69, he does not provide this Court with any examples of what such jury instructions would have said. Accordingly, White has failed to prove that Attorney Brizzi was ineffective in this regard.

### *D. Cumulative Error*

White contends that the cumulative effect of Attorney Brizzi's errors rendered the representation ineffective. "Errors by counsel that are not individually sufficient to prove ineffective representation may add up to ineffective assistance when viewed cumulatively." *French v. State*, 778 N.E.2d 816, 826 (Ind. 2002) (quotation omitted). Here, however, White has not established any errors by Attorney Brizzi; therefore, there can be no cumulative error. *See Lucas v. State*, 499 N.E.2d 1090, 1098 (Ind. 1986) (explaining that alleged errors that do not present a single basis for reversal "do not gain the stature of reversible error when viewed *en masse*").

---

[25] At oral argument, White's attorney argued that Attorney Brizzi should have presented the testimony of White and White's ex-wife as well as White's mail. *See* Oral Arg. at 54:24, *available at* http://goo.gl/MaLuCp.

*E. "Class of One" Claim*

Finally, White claims that the "State violated [his] rights as a member of a 'class of one,' protected by the Equal Protection Clause of the Fourteenth Amendment, prohibited under 42 U.S.C. 1983, by intentionally treating him differently than others similarly situated without a rational basis." Appellant's Br. p. 76. As support for his claim, White directs us to "a partial list of similarly situated persons" in his original and amended petitions for post-conviction relief. *Id.* at 77. Included on this list are judges, town-council members, and political officers from around the state. *See* P-C App. p. 71-81, 1032-46.

The State argues that White is actually alleging selective prosecution. We agree: White's claims all circle back to his assertion that he and other political figures engaged in essentially the same conduct, yet only White was prosecuted. *See* Oral Arg. at 18:01, *available at* http://goo.gl/MaLuCp (Chief Judge Vaidik: "Is your class-of-one claim really in fact a selective-prosecution claim?" White's attorney: "It's different, but I understand to your point as selective prosecution, yes, it would be to that extent but it's a class of one in that he was specifically targeted . . . ."). White cannot succeed on this claim. "Persons accused of wrongdoing can't make class-of-one defenses to criminal charges." *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 902 (7th Cir. 2012) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996) & *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008)), *cert. denied.* "[A] defense of selective prosecution is limited to racial discrimination or other class-wide inequality . . . ." *Id.* The Seventh Circuit's description of the two forms of selective prosecution is particularly useful here:

> The first is simply failing to prosecute all known lawbreakers, whether because of ineptitude or (more commonly) because of lack of adequate

resources. The resulting pattern of nonenforcement may be random, or an effort may be made to get the most bang for the prosecutorial buck by concentrating on the most newsworthy lawbreakers, but in either case the result is that people who are equally guilty of crimes or other violations receive unequal treatment, with some being punished and others getting off scot-free. That form of selective prosecution, although it involves dramatically unequal legal treatment, has no standing in equal protection law. The second form of selective prosecution, and the only one that is actionable under the federal Constitution, is where the decision to prosecute is made either in retaliation for the exercise of a constitutional right, such as the right to free speech or to the free exercise of religion, or because of membership in a vulnerable group.

*Esmail v. Macrane*, 53 F.3d 176, 178-79 (7th Cir. 1995) (internal citations omitted) (citing *Wayte v. United States*, 470 U.S. 598, 607-08 (1985) & *United States v. Smith*, 953 F.2d 1060, 1063 (7th Cir. 1992)). White—a newsworthy lawbreaker who, as Secretary of State, was responsible for ensuring the integrity and security of our state's elections—is alleging the first form of selective prosecution, and for that reason, his claim fails.[26]

### III. Conclusion

Because three of White's six convictions were improper, we remand to the trial court with instructions to vacate White's convictions on Counts 1, 5, and 6. We affirm White's remaining convictions, Counts 2 (perjury), 4 (voting in other precinct), and 7 (theft). With respect to White's post-conviction claims, we conclude that Attorney Brizzi was not ineffective. Because the trial court ordered White's sentences to be served concurrently, his sentence remains the same despite our instructions.

---

[26] Even if we did not view White's claim as one of selective prosecution, he has still waived it. "To state a so-called 'class-of-one' equal protection claim, [the plaintiff] must allege that he was 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) (citations omitted). White does not adequately support his "class of one" claim with cogent argument: he fails to explain how he was intentionally treated differently from others similarly situated and address whether there was a rational basis for the alleged difference in treatment.

54

Affirmed in part, reversed in part, and remanded with instructions.

MAY, J., and BARNES, J., concur.