## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 14 2015, 8:45 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE

Alan W. Jenkins
Pendleton, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Kelly A. Miklos
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Alan W. Jenkins,<br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Respondent.* | October 14, 2015<br><br>Court of Appeals Case No.<br>41A01-1502-PC-77<br><br>Appeal from the Johnson Superior Court<br><br>The Honorable Kevin M. Barton, Judge<br><br>Trial Court Cause No.<br>41D01-0602-PC-1 |

**Kirsch, Judge.**

Alan W. Jenkins was convicted of two counts of child molesting,[1] each as a Class A felony, and was found to be a habitual offender.[2] Jenkins now appeals the denial of his petition for post-conviction relief ("PCR"), raising the following consolidated and restated issues:

> I. Whether Jenkins was denied effective assistance of both trial and appellate counsel; and

> II. Whether the PCR court erred in finding that laches barred consideration of the merits of Jenkins's PCR petition.

We affirm.

## Facts and Procedural History[3]

In the winter of 2002, Jenkins's sister, S.P., and her twelve-year-old daughter, G.P., moved in with Jenkins. During the following two to three months, Jenkins's relationship with G.P. changed from an "uncle/niece relationship," to being friends, and then to a "boyfriend/girlfriend relationship." *Trial Tr.* at

---

[1] *See* Ind. Code § 35-42-4-3.

[2] *See* Ind. Code § 35-50-2-8. We note that, effective July 1, 2014, a new version of these criminal statutes was enacted. Because Jenkins committed his crimes prior to July 1, 2014, we will apply the statutes in effect at the time he committed his crimes.

[3] On direct appeal, Jenkins raised one issue—whether his consecutive and enhanced sentences, totaling one hundred years, violated his Sixth Amendment rights as outlined in *Blakely v. Washington*, 542 U.S.296 (2004). Extensive facts were not necessary for our court to address that sentencing issue. Therefore, unlike most decisions for post-conviction relief, the narrative of facts from the direct appeal are inadequate for the resolution of this case. Accordingly, we use facts set forth in the post-conviction court's decision and, as needed, facts most favorable to the verdict.

575-76.[4] Jenkins and G.P., who was in sixth grade at the time, regularly engaged in sexual intercourse and oral sex, activities that were often accompanied by alcohol and drug use. G.P. would steal liquor and cigarettes from drugstores, and Jenkins would sometimes drive her to the stores. The two spent a great deal of time together, often because G.P. was skipping school. At some point, the two "started doing 'crack' together." *Id*. at 587.

[4] From December 2002 through August 2003, Jenkins, S.P., and G.P. lived in various apartments, and on August 25, 2003, all three moved into a home located on East Main Street in Greenwood, Johnson County, Indiana. G.P. remained in that home until December 11, 2003, when she was taken into custody by Juvenile Probation for having violated her probation for truancy. Immediately after being taken into custody, G.P. failed a mandatory drug screen, by testing positive for cocaine, marijuana, and alcohol. This, among other factors, resulted in G.P. being placed into Fresh Start, a placement home for juveniles who have been removed from their home and placed into the care of a state agency.

[5] In February 2004, Court Appointed Special Advocate ("CASA") Roger York investigated G.P.'s case and filed a report with the trial court regarding his

---

[4] Because we cite to documents from the original trial, direct appeal, and PCR evidentiary hearing, we use the following designations: *Appellant's App*. and *Appellee's App*. refer to the appendices filed in connection with Jenkins's direct appeal; *PCR App*. refers to appellant's appendix filed in connection with the instant appeal; and *Trial Tr*. and *PCR Tr*. refer, respectively, to the transcripts from the trial and PCR evidentiary hearings. Because the record before us contains only briefs filed in connection with the instant appeal, we refer to those as *Appellant's Br*. and *Appellee's Br*.

findings. CASA York reported that he had met with S.P., Jenkins, and their mother, Beverly Jenkins ("Beverly") at the East Main Street home. During his visit, CASA York told G.P.'s family that there could be no drugs or alcohol in the home. When S.P. interrupted to ask when G.P. would be allowed to come home, the CASA explained that G.P. would have to complete her alcohol abuse program. *PCR App.* at 261. S.P. said that she understood; however, Jenkins "kept objecting and at one point accused the Court of kidnapping [G.P]." *Id.* "Beverly said that she had seen this coming for a long time and she indicated that there was something wrong with [Jenkins]." *Id.* Meanwhile, during Fresh Start counseling sessions, G.P. provided counselors with the names of men with whom she claimed to be sexually active.

[6] As part of the his report, CASA York reported that he called Johnson County Probation Officer Shannon Chambers ("Chambers") and Office of Family Services Case Manager Deborah Anderson ("Anderson")[5] and "expressed concerns about [Jenkins]." *Id.* CASA York did not expressly state the nature of his concerns. Both Chambers and Anderson indicated that they also had concerns, and Fresh Start was alerted to the concerns. Within a few weeks, G.P. admitted to Fresh Start employees that it was her uncle, Jenkins, with

---

[5] In late 2003 and early 2004, G.P.'s Case Manager was Deborah Corley. Subsequent to Jenkins's trial, but prior to the PCR evidentiary hearings, Corley married and changed her last name to Anderson. Accordingly, we will refer to her by the name Anderson.

whom she was engaging in oral sex and sexual intercourse and that he, in part, "controlled her by hooking her on cocaine." *Id*. at 261.

[7] Detective Patti Cummings, of the Greenwood Police Department, was the lead investigator and first became involved in the investigation in early February 2004. On February 17, 2004, the State charged Jenkins with three counts of child molesting, each as a Class A felony; in March 2004, the State added the charge of contributing to the delinquency of a minor as a Class A misdemeanor and alleged that Jenkins was a habitual offender. Jenkins initially requested that the DNA found at the scene, which implicated him, be retested. However, upon learning that the retesting would not be completed until after the deadline for his speedy trial, Jenkins chose to abandon the retesting and pursue his right to a speedy trial. Attorney James Dunn ("Dunn") was initially appointed as Jenkins's public defender, but was relieved of his appointment when other commitments interfered with Jenkins's request for a speedy trial. John P. Wilson ("Wilson") accepted the appointment as Jenkins's new public defender and entered an appearance at a hearing on April 5, 2004. The jury trial commenced about twenty-eight days later. Wilson served as Jenkins's counsel during the jury trial and through sentencing.

[8] Jenkins's trial commenced in Judge Kevin Barton's courtroom on May 3, 2004 and ran through May 11, 2004. The jury found Jenkins guilty of two counts of Class A felony child molesting—one for engaging in sexual intercourse with G.P. and one for receiving oral sex from G.P.—and determined he was a habitual offender. The jury, however, acquitted Jenkins of one count of Class

A felony child molesting, for providing oral sex to G.P., and of Class A misdemeanor contributing to the delinquency of a minor. The trial court entered judgment of conviction on the jury verdicts and sentenced Jenkins to two enhanced thirty-five-year terms for the child molesting and another thirty-year term for being a habitual offender, all to be served consecutively, for an aggregate sentence of 100 years.

[9] Attorney Charles Gantz ("Gantz") served as Jenkins's appellate counsel, raising only a sentencing issue on direct appeal. A panel of this court affirmed Jenkins's sentence in an unpublished memorandum decision; however the case was remanded for the trial court to link the habitual offender status to one of the felony convictions. *Jenkins v. State*, No. 41A01-0502-FA-1, slip op.at 1-6 (Ind. Ct. App. June 28, 2005). An amended sentencing order was entered on August 24, 2005.

[10] Acting pro se, Jenkins filed a Verified Petition for Post-Conviction Relief on February 8, 2006, alleging that he was denied the effective assistance of both trial and appellate counsel. On March 17, 2006, the appointed public defender filed a notice of "present inability to investigate". *PCR App.* at 97. Jenkins asked that the PCR court to "stay all proceedings in this case until such time as counsel is ready to proceed." *Id.* By order dated April 6, 2006, the PCR court granted Jenkins's request, stating the "matter be set for hearing when Petitioner's counsel notifies the court of her ability to proceed." *Id.* Jenkins's counsel never notified the PCR court; instead, she obtained the court's

permission to withdraw from the case on July 1, 2008. This triggered the PCR court to set the post-conviction petition for a hearing on September 18, 2008.

[11] On three occasions in 2009, the PCR court granted Jenkins a continuance and reset the hearing. When Jenkins requested a fourth continuance, the PCR court vacated the scheduled hearing, noting that the hearing would be reset after Jenkins had completed legal research and discovery. *PCR App.* at 98. No entries were made on the CCS from December 7, 2009 until March 3, 2011, at which time Jenkins informed the PCR court that he was still not ready to proceed with a hearing.

[12] On February 2, 2012, Jenkins requested public funds to obtain independent DNA testing and to hire an expert witness; the PCR court denied the request and also denied Jenkins's motion to certify that order for interlocutory appeal. On June 22, 2012, Jenkins filed an unverified motion to amend his PCR petition in part. An evidentiary hearing began on November 28, 2012, with Judge Barton again presiding. Trial counsel Wilson, G.P, and two other witnesses testified as witnesses for Jenkins; however, when time ran short, the PCR court ordered the hearing be reconvened on February 21, 2013. Later, the hearing was reset to May 29, 2013, due to a congested court calendar. On that day, Jenkins called seven witnesses, including his mother, his sister-in-law, Probation Officer Chambers, appellate attorney Gantz, Wilson, and G.P.; however, upon discovering that Jenkins's witness, Case Manager Anderson, had not been subpoenaed, the PCR court retained a private investigator to

locate and serve Anderson. Once Anderson was located, the hearing was rescheduled for September 17, 2013, and was concluded that same day.

[13] Following the three-day evidentiary hearing, the PCR court denied Jenkins's PCR petition, finding that both trial counsel and appellate counsel provided effective assistance of counsel and that the affirmative defense of laches barred relief to Jenkins as to the underlying convictions. Jenkins now appeals.[6]

## Discussion and Decision

[14] Jenkins contends that the post-conviction court erred in denying his petition for post-conviction relief. Post-conviction proceedings provide a narrow remedy to raise issues that were not known at the time of the original trial or were unavailable on direct appeal. *White v. State*, 25 N.E.3d 107, 132 (Ind. Ct. App. 2014), *trans. denied*. The petitioner in a post-conviction proceeding bears "the burden of establishing his grounds for relief by a preponderance of the evidence." Ind. Post-Conviction Rule 1(5); *White*, 25 N.E.3d at 132. When issuing its decision to grant or deny relief, the post-conviction court must make findings of fact and conclusions of law. P-C.R. 1(6). Here, the PCR court set forth its findings and conclusions in a ninety-two page decision.

[15] When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *White*, 25 N.E.3d at

---

[6] We commend the PCR court for the thoroughness and clarity of its findings, which greatly aided appellate review of this case.

132. In conducting our review, we neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the judgment. *McKnight v. State*, 1 N.E.3d 193, 199 (Ind. Ct. App. 2013), *trans. denied*. "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Passwater v. State,* 989 N.E.2d 766, 770 (Ind. 2013) (citation and quotation marks omitted). In other words, if a post-conviction petitioner was denied relief in the proceedings below, he must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite the one reached by the post-conviction court. *Massey v. State,* 955 N.E.2d 247, 253 (Ind. 2011). Post-conviction relief does not offer the petitioner a super appeal; rather, subsequent collateral challenges must be based on grounds enumerated in the post-conviction rules. *McKnight,* 1 N.E.3d at 199. Where, as here, the judge who presided over the defendant's trial is also the judge who presided over his post-conviction proceedings, the post-conviction court's findings and judgment should be entitled to "greater than usual deference." *Hinesley v. State,* 999 N.E.2d 975, 982 (Ind. Ct. App. 2013), *trans. denied*.

# I. Ineffective Assistance of Counsel[7]

[16] Jenkins contends that he was denied effective assistance of both trial and appellate counsel. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components." *Id*. First, the defendant must show that counsel's performance was deficient. *Garcia v. State*, 936 N.E.2d 361, 364 (Ind. Ct. App. 2010) (citing *Strickland*, 466 U.S. at 364), *trans. denied*. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed to the defendant by the Sixth and Fourteenth Amendments of the United States Constitution. *Id*. (citing *Strickland*, 466 U.S. at 687-88). Second, the defendant must show that the deficient performance resulted in prejudice. *Id*. To establish prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.

---

[7] Jenkins filed his original PCR petition in 2006 and amended the PCR petition, in part, on June 22, 2012. The PCR court noted that this amendment was not verified as required by Post-Conviction Rule 1(2) or in the form specified by Post-Conviction Rule 1(3). The trial court nevertheless accepted the document as an elaboration of the grounds set forth in Jenkins's 2006 PCR Petition, and not as an amendment to the PCR Petition. Nevertheless, the PCR court addressed many of the issues listed in the "amendment." To the extent it is necessary, we will do the same.

*Id.* (citing *Strickland*, 466 U.S. at 694). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perryman v. State*, 13 N.E.3d 923, 931 (Ind. Ct. App. 2014), *trans. denied*.

[17] Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). "We will not lightly speculate as to what may or may not have been an advantageous trial strategy, as counsel should be given deference in choosing a trial strategy that, at the time and under the circumstances, seems best." *Perry v. State*, 904 N.E.2d 302, 308 (Ind. Ct. App. 2009), *trans. denied*. Isolated omissions or errors, poor strategy, or bad tactics do not necessarily render representation ineffective. *Shanabarger v. State*, 846 N.E.2d 702, 708 (Ind. Ct. App. 2006), *trans. denied*. The two prongs of the *Strickland* test are separate and independent inquiries. *Manzano v. State*, 12 N.E.3d 321, 325 (Ind. Ct. App. 2014), *trans. denied*, *cert. denied*, 135 S. Ct. 2376 (2015). Therefore, "if it is easier to dispose of an ineffectiveness claim on one of the grounds instead of the other, that course should be followed." *Talley v. State*, 736 N.E.2d 766, 769 (Ind. Ct. App. 2000).

[18] Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we cannot affirm the judgment on any legal basis, but rather, must determine if the court's findings are sufficient to support its judgment. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962 (Ind. Ct. App. 2011). Although we do not defer to the post-conviction court's legal

conclusions, we review the post-conviction court's factual findings under a clearly erroneous standard. *Id.* Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id.*

### A. Trial Counsel

Jenkins argues that the PCR court erred by finding that Wilson provided effective assistance of trial counsel. Specifically, Jenkins contends that his trial counsel was ineffective under both the standard set forth in *Strickland* and the standard set forth in *United States v. Cronic*, 466 U.S. 648 (1984), a companion case to *Strickland*. The *Cronic* test for ineffective assistance of counsel applies when the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial; one circumstance warranting the presumption is the complete denial of counsel, that is, when counsel is either totally absent or was prevented from assisting the accused during a critical stage of the proceeding. *Cronic*, 466 U.S. at 660-61.[8]

---

[8] While we note that Wilson's defense resulted in Jenkins being acquitted of one Class A felony count of child molesting and Class A misdemeanor contributing to the delinquency of a minor, our Supreme Court has said, "We do not determine adequacy of representation on the basis of whether or not an acquittal was won." *Dillon v. State*, 448 N.E.2d 21, 27 (Ind. 1983).

### 1. *Cronic*

[20] We first address whether Wilson provided ineffective assistance of trial counsel under the *Cronic* standard. We begin by noting that, while Jenkins raised this ineffective assistance of trial counsel issue in his motion to amend in part his PCR petition, and the PCR court mentioned the *Cronic* case in its findings of facts and conclusions of law, Jenkins did not refer to the *Cronic* standard during the three-day PCR hearing. *PCR App.* at 19, 127-28. This clearly was not the focus of Jenkins's attention, nor should it have been. In *Cronic*, the United States Supreme Court held that there are three scenarios in which the defendant need not satisfy the *Strickland* test, because prejudice is presumed: (1) where there is a complete denial of counsel; (2) where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) where counsel is asked to provide assistance in circumstances where competent counsel likely could not. *Cronic*, 466 U.S. at 659-60.

[21] The *Cronic* Court further explained that "only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *Id.* at 662. United States Supreme Court Justice Powell explained that, under the circumstances described in the third situation, "the defendant is in effect deprived of counsel altogether, and thereby deprived of any meaningful opportunity to subject the State's evidence to adversarial testing." *Kimmelman v. Morrison*, 477 U.S. 365, 395 n.2 (1986) (Powell, J., concurring). Our Supreme

Court has reiterated that a petitioner "faces an extremely heavy burden in making his *Cronic* claims." *Ward v. State*, 969 N.E.2d 46, 77 (Ind. 2012).

[22] Jenkins maintains that the instant facts fall within the third scenario and that the late appointment of Wilson as trial counsel, essentially justified a presumption of prejudice "without inquiry into the actual conduct of the trial." *Appellant's Br.* at 24. We disagree.

[23] In *Ward*, our Supreme Court discussed *Cronic,* stating:

> [T]he district court had appointed a young lawyer with a real estate practice who had never conducted a jury trial to represent a defendant who had been indicted for mail fraud. Although it had taken the government four-and-one-half years to investigate the case and review thousands of documents, this young lawyer had only 25 days for pretrial preparation. The Tenth Circuit had held that these circumstances, among others, justified a presumption of ineffectiveness without inquiry into performance or prejudice. The Supreme Court disagreed. While recognizing that certain extreme circumstances justify such a presumption, the Supreme Court held that the circumstances at issue in that case did not make it unlikely that the defendant could have received effective assistance of counsel.

*Ward*, 969 N.E.2d at 77.

[24] The same reasoning applies to the facts before us. The PCR court found that Wilson is, and in 2004 was, an experienced attorney. *PCR App.* at 20. Since 1988, Wilson "provided criminal defense, mostly on felony cases." *Id*. Wilson: (1) had maintained a public defender contract with Johnson County since 1988, at least fifteen years prior to his representation of Jenkins; (2) had tried upwards

of 100 criminal trials; and (3) handled several hundred criminal cases a year. *Id*. Additionally, Wilson was appointed as Jenkins's counsel more than twenty-five days prior to trial. This case is not one in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel. *Cronic*, 466 U.S. at 666. Accordingly, Jenkins has not met his burden of proving that Wilson provided ineffective assistance of trial counsel pursuant to the *Cronic* standard.

### 2. Strickland

[25] Under the *Strickland* standard, Jenkins contends that Wilson failed to: depose, subpoena, question, or impeach witnesses; adequately investigate the case; have DNA tested by an independent expert, thereby making Jenkins chose between DNA results and a speedy trial; object to jurors who were not impartial and unbiased; and object to prosecutorial misconduct. Jenkins also argues that Wilson was ineffective for failing to ensure better acoustics and equipment in the courtroom, where that failure produced an inaccurate or incomplete trial transcript.

[26] Jenkins asserts that Wilson was ineffective when he failed to depose or subpoena CASA York and Detective Cummings. Jenkins contends that CASA York was the heart of the case; specifically, he was the one who, in his CASA report, first stated that he had concerns about Jenkins. In the absence of CASA York sharing his concerns with Chambers and Anderson, Jenkins would never have been included in the investigation that resulted in charges being filed against him. *Appellant's Br*. at 7. The State responds that trial counsel made a

reasonable strategic decision not to further investigate or present testimony from CASA York because CASA York did not make "accusations of criminal conduct against Jenkins." *Appellee's Br.* at 15. The PCR court agreed with the State.

[27] During the PCR evidentiary hearing, Wilson testified that "Roger York was not the 'accuser' of Mr. Jenkins," but rather, he "authored a CASA report that he took information on." *PCR App.* at 36 (citing *PCR Tr.* at 104). The PCR court noted that the CASA report did not indicate that CASA York initiated the investigation of Jenkins, nor did it state that CASA York contacted Corley and Anderson to report concerns about molestation. *Id.* From this, the PCR court concluded, "Mr. Jenkins has failed to show how Mr. Wilson's failure to call Mr. York, who had expressed concerns about Mr. Jenkins, would have benefitted the case." *Id.* at 37. The PCR court's findings as to this claim were supported by the record and are sufficient to support a finding that Wilson was not ineffective.

[28] Jenkins also contends that trial counsel was ineffective for failing to question Detective Cummings regarding false accusations G.P. had made about other men having molested her. *Appellant's Br.* at 9. Specifically, he contends that, such questions could have created a reasonable doubt by showing that G.P. lied or that someone else was the perpetrator. The State responds that Wilson has failed to show either deficient performance or prejudice. *Appellee's Br.* at 18. Specifically, Wilson cannot be found to have been ineffective for failing to present the irrelevant question of whether G.P. had other sexual relations,

where that question had no bearing on the proof of whether Jenkins had had improper sexual relations with G.P.[9] *Id.*

[29]     Error, if any, in Wilson's failure to question Detective Cummings regarding G.P.'s credibility created no prejudice. Wilson effectively probed into G.P.'s credibility in other ways. *PCR App.* at 32. While G.P. testified that Jenkins was the one who repeatedly molested her, she also admitted at trial that she had made false accusations against numerous adult men concerning sexual encounters. *Trial Tr.* at 765-69. Further, the PCR court found that Wilson's questioning of G.P. revealed that she skipped school, lied, and "stole candy, clothes, liquor, cigarettes, and oxycontin from a man without legs." *PCR App.* at 31. G.P. admitted that she drank and smoked "weed" in fourth grade and that she eventually used cocaine. *Id.* The PCR court concluded that Wilson established that G.P. "had often been untruthful and she had made false statements regarding sex and molestation." *Id.* at 32. We agree with the PCR court. In light of G.P.'s own admissions, Wilson's failure to question Detective Cummings about G.P.'s false accusations that other men had sex with her could not have prejudiced Jenkins. The PCR court's findings as to this claim

---

[9] The State maintains that Jenkins has waived this issue for appellate review by failing during the PCR evidentiary hearing to "present Wilson's failure to question Detective Cummings about other adults that G.P. admitted to having sexual relations with as a basis of ineffective assistance of counsel." *Appellee's Br.* at 18. We disagree; this issue is not waived. During the PCR hearing, Jenkins did question Wilson regarding why he did not question Detective Cummings as to why there was no investigation into the other men, resulting in Jenkins being the only one charged with child molesting. *PCR Tr.* at 23-28.

were supported by the record and are sufficient to support a finding that Wilson was not ineffective.[10]

[30] Jenkins asserts that Wilson was ineffective when he failed to call his mother, Beverly, and his sister-in-law, Lynette, to testify on his behalf. He contends that Beverly would have testified that she read letters that Jenkins sent to G.P. while she was in Fresh Start, and that none of them were inappropriate. She also would have highlighted inconsistencies in G.P.'s testimony. He alleges that Lynette would have testified that she was the person G.P. contacted after she had been caught shoplifting. Jenkins maintains that both of these witnesses would have been credible witnesses and would have created doubt regarding G.P.'s credibility. Regardless of whether Wilson should have called these two witnesses, his failure to do so, did not prejudice Jenkins. As noted above, a significant amount of testimony was introduced regarding G.P.'s history of taking drugs, stealing, and lying. The jury was presented with evidence with which to scrutinize her testimony to determine what they could believe. Wilson was not ineffective for failing to call these two witnesses to testify.

[31] Jenkins maintains that Wilson was ineffective for not thoroughly challenging G.P.'s testimony that described sitting on an orange recliner at the time when

---

[10] Claiming newly discovered evidence, Jenkins asserts that G.P. wrote a letter after trial, in October 2007, stating that she made up places these crimes happened. Jenkins argues that this letter, combined with G.P.'s deposition "proves her credibility should be deemed dubious at best." *Appellant's Br.* at 11. The PCR court found that this letter provided no new evidence that was not already presented at trial. *PCR App.* at 90. Furthermore, we find, that to the extent Jenkins wanted to use this letter to attack G.P.'s credibility, Wilson had already attacked G.P.'s credibility during trial.

Jenkins had vaginal intercourse with her. Jenkins offers that G.P. changed her story when no DNA was found on the recliner, and that Wilson should have been prepared to impeach G.P. when she changed her story regarding where and how Jenkins had sexual intercourse with her on an orange recliner.

[32] During final argument, Wilson highlighted for the jury that "neither Mr. Jenkins'[s] nor [G.P.'s] genetic material was found on the recliner, and that fact contradicted G.P.'s testimony of having had sex in the chair." *PCR App.* at 25. When questioned during the PCR hearing whether he should have questioned G.P. about changing her story as to sex in the recliner, Wilson testified that there was no need because there was so much evidence of Jenkins's guilt, and, thus, the recliner "really played a pretty small part in the accumulation of evidence against [Jenkins]." *Id*. at 26. Wilson asserted that he would have risked alienating the jury if he had questioned G.P. on every inconsistency. The PCR court noted that Wilson effectively handled the cross-examination of G.P.'s testimony regarding having had sex with Jenkins in the recliner in a manner that was designed to discredit G.P. without building sympathy for her. *Id*. at 26. Accordingly, the PCR court concluded that Wilson was effective in handling this issue. Jenkins has not met his burden of proving otherwise.

[33] Jenkins next asserts that Wilson was ineffective because he did not investigate the case. Jenkins specifically focuses on the fact that Wilson did not make a personal visit to the home or tree house, both of which G.P. alleged were locations where Jenkins committed sex acts with G.P. Jenkins maintains that he was prejudiced because a visit to the scene would have revealed that sex

could not have happened in the places as alleged. He elaborates that there were sticker bushes under the tree house and that a visit would have revealed that sex could not have occurred there as G.P. contends. Jenkins also asserts that his seminal fluid was found on floor boards removed from an empty adjoining apartment, but that Wilson did not probe into a discrepancy regarding Detective Cummings's testimony as to when floor boards were removed for DNA testing. The State responds that Wilson retained the services of J.P. Renner, a professional investigator, and that Wilson familiarized himself with the surroundings based on that investigator's photographs of the scene. Further, the State contends that Jenkins cannot show that any prejudice resulted from a discrepancy about the date when the floor boards were removed. We agree.

[34]  While Wilson did not go to the house or the tree house, his investigator did. The PCR court found, "Inasmuch as attorneys commonly use the services of trained investigators for the purpose of investigation and developing cases for trial, the Court does not find that Mr. Wilson was deficient in his representation of Jenkins." *PCR App*. at 22. Regarding allegations of Wilson's ineffectiveness for failure to investigate the tree house, the PCR court noted that the tree house was not in Johnson County and that events occurring at the tree house "were not part of the acts for which Mr. Jenkins stood trial" in the instant case. *Id*. at 24. Addressing the discrepancy in the removal date of the floor boards, the PCR court, while unable to definitively determine the date that the boards were removed, found that Wilson provided effective assistance of counsel. During

closing argument, Wilson "dealt with the issue that the presence of Mr. Jenkins's seminal fluid on the floor . . . does not mean that he engaged in sex with G.P. at that location." *Id*. at 23. Even the landlord had testified that Jenkins had been in the adjoining apartment. The PCR court concluded that Jenkins had failed to prove that Wilson's assistance was ineffective due to a "failure to take further steps in relation to the genetic material found on the boards in the adjoining vacant apartment." *Id*. at 23-24. On appeal, Jenkins has not convinced us that the PCR court's finding—that Wilson properly investigated the case—is clearly erroneous.

### *Coaching*

[35]   In a summary fashion, Jenkins contends that Wilson was ineffective when he failed to pursue the issue of whether G.P. had been coached. During a bench conference, Wilson and Prosecutor Daylon Welliver said,

> Mr. Welliver:  Yeah, but . . . I don't know what kind of answer you're gonna get from her.
>
> Mr. Wilson:  Didn't you coach her?
>
> Mr. Welliver:  I didn't, I didn't anticipate this line of questioning.
>
> Mr. Wilson:  You're a numbskull, you ought to be anticipating anything out of me.

*Trial Tr*. at 764. Jenkins's only argument on this issue was to pose the rhetorical question of how an attorney who made such a comment could be effective.

[36] The PCR court found that the comment by Wilson was "no more than a display of his humor." *PCR App.* at 94. "The working relationship between deputy prosecuting attorneys and defense bar often displays playful jabs from one to the other . . . . It is part of Johnson County legal culture." *Id.* The PCR court also found significant that the comment was made in a bench conference and not to the jury. *Id.* We agree with the PCR court that Wilson's comments during this bench conference are no indication that Wilson was ineffective, and Jenkins has not met his burden of proving otherwise.

## DNA

[37] Jenkins argues that his trial counsel was ineffective for failing to have an independent expert retest the "vital DNA evidence" before trial, which would have provided exculpatory evidence. *Appellant's Br.* at 14-15. Responding to the claim that he chose the right to a speedy trial over the ability to retest the DNA, Jenkins asserts that he should have been able to have both.

[38] During the post-conviction hearing, Jenkins's first trial counsel, Dunn, testified that he and Jenkins had discussed having the DNA retested. Dunn informed Jenkins that an independent test would take several months to complete and that, in order to have the DNA tested, the request for a speedy trial would have to be withdrawn. Jenkins decided to proceed with the speedy trial, and Wilson served as trial counsel. The PCR court found:

> Jenkins asserts that he had a right to obtain an independent DNA analysis in the case. He was granted funds to obtain an independent DNA analysis. However, an independent DNA

analysis could not be made within the time period established by
Mr. Jenkins's request for a speedy trial. Mr. Jenkins asserts that
he has a right to obtain an independent DNA analysis within the
time period established by his request for a speedy trial. The
Court is unaware of any authority that requires independently
hired third party experts to conform to the time limits imposed by
a request for a speedy trial. As testified to by Mr. Wilson, a
request for a speedy trial may impose limitations upon the
defense. Here, Mr. Jenkins had the opportunity to obtain
independent DNA analysis but rejected that opportunity so that
the trial could be held within the time period set by his request
for a fast and speedy trial.

*PCR App.* at 28 (citation omitted).

[39]    The PCR court's findings that trial counsel followed Jenkins's wishes by

moving ahead with the speedy trial, instead of waiting for the DNA to be

retested, were supported by the evidence in the record. On appeal, Jenkins has

cited to no authority that challenges the PCR court's conclusion that, under the

facts of this case, Jenkins had to choose between his right to a speedy trial and

taking the time to retest the DNA. Under the circumstances, we cannot say

that Wilson was ineffective for proceeding with a speedy trial instead of having

the DNA retested. Moreover, Jenkins has failed to show that the lack of testing

was prejudicial to him. Here, Jenkins does not deny that the DNA found on

the floor boards at the neighboring apartment was his, or that both his and

G.P.'s DNA were mixed in samples obtained from a comforter. Instead, he

maintains that the State's expert witness was not clear in explaining the results

of each sample as it related to the sexual act alleged. Jenkins cannot show that,

had the retesting been done, the outcome of his trial would have been different. Wilson provided effective counsel regarding the testing of the DNA.

### *Prosecutorial Misconduct*

[40]   Jenkins contends Wilson did not object to, what Jenkins deemed to be, prosecutorial misconduct. During closing argument, Prosecutor Welliver explained that the judge would read instructions about the elements of the crimes, but explained that the jury could follow a simpler path. "Ultimately, your choice is whether you believe that [G.P.] told you the truth on the stand, or whether you believe what [Jenkins] told the police." *Trial Tr.* at 1077. Jenkins argues that when Wilson did not object to this statement, he essentially misled the jury into believing that Jenkins could be convicted without the State having to prove each element of the offense, specifically, the element of penetration.[11]

[41]   The PCR court noted that, in most cases, a conviction for child molesting depends on the testimony of the alleged victim; other evidence may corroborate or detract from the victim's testimony, but the victim's testimony, if credible, establishes the requisite statutory elements. *PCR App.* at 85. The prosecutor's comment was no more than a recognition of that dynamic. *Id.* Further, the

---

[11] As part of this argument, Jenkins argues that Wilson was ineffective when he did not investigate or consult with a medical expert "concerning the fact that the victim who alleged to have been sexually assaulted was never physically or psychologically examined to prove she was not a virgin or if she was a chronic pathological liar unable to even tell the truth." *Appellant's Br.* at 26. The evidence of G.P.'s prior sexual activity, if any, would not have been relevant to the issue of whether Jenkins had molested G.P. Further, Wilson provided more than sufficient evidence to place G.P.'s credibility into question.

jury was correctly instructed as to the elements of each offense, and while penetration is not an element itself, it is included within the definition of sexual intercourse and deviate sexual conduct, both of which are elements. *Id.* at 86 (citing *Trial Tr.* at 1142-46). During the PCR hearing, Wilson testified that it was his recollection that G.P. testified as to all of the elements of child molesting. The PCR court concluded that Jenkins's assertion of prosecutorial misconduct was without merit. *Id.* We agree.

[42] Here, the jury was properly instructed as to each of the charges and as to the elements required to prove each of the charges. On appeal, Jenkins does not deny that G.P.'s testimony, if believed, satisfied all of the elements of the crimes for which he was convicted. Wilson was not deficient when he did not object to the prosecutor's comment regarding credibility.

### *Acoustics and Jury*

[43] Jenkins maintains that ineffective assistance of his trial counsel resulted in a due process violation when Wilson did not object to "the environment, acoustics and audio equipment" used during trial, which produced an inaccurate or incomplete transcript. *Appellant's Br.* at 27. The PCR court stated that transcription is subject to factors such as a soft-spoken witness or attorney, the distance of a person from the microphone, or people who talk over each other. *PCR App.* at 87. Acknowledging that the transcript contains numerous notations of "inaudible," the PCR court concluded that Jenkins had failed to show that a complete transcript would have changed the outcome of the case.

*Id.* In other words, Jenkins has not met his burden of proving that language that was not transcribed was material.

[44] On appeal Jenkins argues that the missing language was material. Specifically, he argues that the record supports a finding that he did not have an impartial jury. Jenkins alleges that he was prejudiced because a biased potential juror, who stated that he would give greater weight to the testimony of a known officer, may have been selected as a juror; however, Jenkins could not know with certainty who was chosen because "inaudible" was transcribed in the place of the juror's name. *Trial Tr.* at 125. Our review of the record before us reveals that Wilson engaged in extensive voir dire and thoroughly questioned potential jurors to root out any bias they might have against Jenkins. Moreover, Jenkins has not met his burden of proving that he was prejudiced by his inability to second guess Wilson's selection of jury members, especially under circumstances where the jury acquitted Jenkins of one count of Class A felony child molesting and one count of Class A misdemeanor contributing to the delinquency of a minor. The PCR court concluded that Wilson provided effective assistance of counsel. Jenkins has presented no evidence that leads this court to come to a different conclusion.[12]

---

[12] Jenkins also briefly mentions that bad equipment prevented the jurors from hearing testimony, thereby preventing him from having a fair trial. Jenkins cites to numerous cases to support his claim that he is entitled to a fair trial; however, he fails to present a cogent argument on this issue as required by Indiana Appellate Rule 46(A)(8)(a). Consequently, we find the issue waived. *See Howard v. State*, 32 N.E.3d 1187, 1195 n.11 (Ind. Ct. App. 2015) (argument waived due to his lack of cogent argument).

[45] The PCR court concluded that Jenkins failed to meet his burden of proving that Wilson provided ineffective assistance of trial counsel as to the issues discussed above and "in all other respects." *PCR App.* at 87. We agree, and affirm the PCR court's denial of Jenkins's PCR petition alleging ineffective assistance of trial counsel.

### B. Appellate Counsel

[46] Jenkins next asserts that his appellate counsel Gantz provided ineffective assistance.[13] Specifically, he argues that Gantz was ineffective for failing to raise "every possible" significant and obvious error, as well as ones that Jenkins told Gantz to appeal. *Appellant's Br.* at 34. The standard of review for ineffective assistance of appellate counsel is the same as that for trial counsel. *Hollowell v. State*, 19 N.E.3d 263, 269 (Ind. 2014). A petitioner must show that the representation provided by appellate counsel was, in fact, deficient and that the deficiency resulted in prejudice. *Id.* Ineffective assistance of appellate counsel claims generally fall into three categories: 1) denial of access to an appeal; 2) waiver of issues; and 3) failure to present issues well. *Id.* at 270. Petitioner's claims fall into the second of these categories.

---

[13] We note that the PCR court granted Jenkins's petition for post-conviction relief as to one of his issues. The PCR court found that appellate counsel's representation fell below an objective standard of reasonableness when Gantz failed to notify Jenkins of our court's decision on direct appeal, which caused Jenkins to miss the deadline to file his petition to transfer the case to our Supreme Court. *PCR App.* at 70. The PCR court also found that the error was so serious that it resulted in a denial of Jenkins's right to counsel. *Id.* at 104. Accordingly, the PCR court found Jenkins was entitled to correction of his sentence. *Id.* at 104, 105. This issue is not before this court.

[47] Jenkins contends that appellate counsel had a duty to raise every issue on appeal. He recognizes that in order to prevail on a claim of ineffective assistance of appellate counsel he must show that counsel failed to present an issue that was significant and obvious on the record and that this failure cannot be explained by any reasonable strategy. Further, this failure must result in prejudice.

[48] Jenkins "incorporates by reference" the claims that he made regarding trial counsel. *Appellant's Br*. at 35. In this way, Jenkins essentially contends that appellate counsel was ineffective for failing to raise on appeal each alleged error of trial counsel. Because Jenkins did not prove that his trial counsel was ineffective as to the issues raised in his PCR petition, Jenkins's argument that appellate counsel was ineffective for failing to raise those same issues on direct appeal is without merit. *See Dawson v. State*, 810 N.E.2d 1165, 1178 (Ind. Ct. App. 2004) (where defendant failed to prove that he was prejudiced by trial counsel's representation, his argument that appellate counsel was ineffective for raising those same issues on direct appeal was without merit), *trans. denied*.

## II. Laches

[49] Jenkins argues that the PCR court erred in determining that his petition was barred by the doctrine of laches because, here, the State failed to prove by a preponderance of the evidence that he unreasonably delayed in seeking relief and that the State was prejudiced by the delay. *Armstrong v. State*, 747 N.E.2d 1119, 1120 (Ind. 2001). The PCR court determined, and we have affirmed, that

Jenkins's claims of ineffective assistance of trial and appellate counsel must fail. Consequently, this issue is moot because, even if we find that Jenkins had timely brought the appeal and is not guilty of laches, he presents no issue on the merits justifying reversal of the PCR court's denial of his PCR petition. *See Fisher v. State*, 519 N.E.2d 539, 541 (Ind. 1988) (determining that court need not reach issue of laches when Fisher lost on merits of PCR petition); *see also Douglas v. State*, 510 N.E.2d 682, 683 (Ind. 1987) (determining that laches was "of no legal consequence" because Douglas's petition for post-conviction relief was without merit).

Affirmed.

Najam, J., and Barnes, J., concur.